STATE *vs.* MICKELE UZZO.

*Criminal Law—Homicide—Murder—Malice— Intent— Accident —Dying Declarations; Contradiction of—Evidence—Rule as to Six Witnesses to Single Point; Applies to Murder Cases—Reasonable Doubt.*

1. Certain testimony offered by the State held inadmissible, it being neither a dying declaration nor a part of the *res gestae.*

2. It being uncertain and vague as to what time elapsed between the shooting and the conversation sought to be introduced, *held* inadmissible.

3. A witness for the prisoner testified that at the time they took the deceased away and put her in the ambulance, she said to the witness "Godfather they are going to take me away; I am going to die. You take care of my children." *Held* that any statement which the deceased then made as to how the shooting happened was admissible as a dying declaration. The same witness testified that the deceased said to him "Godfather, Mike is not at fault, and I want him not to be arrested and to take care of the children." Upon motion to strike out this testimony it was ordered that the part which referred to her desire not to have Mike arrested and to take, care of her children should be stricken out, but the part in which she said it was not the prisoner's fault should remain.

4. The defendant having put in evidence the dying declaration of the deceased, and the State being precluded from cross-examination as to such declaration, the State is permitted to contradict it by statements made by the deceased at or about the same time.

5. Six witnesses testified that the deceased said the prisoner was not at fault and that the shot went off accidentally. A seventh witness was called and objected to under the rule. It was contended that the rule did not apply in a murder case. *Held* that there was no distinction as to the application of the rule, between murder cases and other cases; that only six witnesses could testify as to the one point.

6. Murder, manslaughter and malice defined.
7. The presumption of law stated where the killing was done with a deadly weapon.

(*Feb.* 13, 1907.)

LORE, C. J., and PENNEWILL and BOYCE, J. J., sitting.

*Daniel O. Hastings*, Deputy Attorney-General, for the State.

*J. Frank Ball* for the prisoner.

Court of Oyer and Terminer, New Castle County, February, 1907.

INDICTMENT FOR MURDER IN THE FIRST DEGREE. See facts in charge of Court.

At the trial, Atonio Destafano, a witness called on behalf of the State, having testified that he was at the house of the prisoner and saw his wife previous to the shooting, and that about three-quarters of an hour later he returned, and there was a crowd going in the prisoner's house and the witness went in too, and upon going to the bed-room, found the prisoner's wife lying on the bed, having been wounded by a pistol shot in the left side of the abdomen; was asked by the Deputy Attorney-General what Kathrina A. Uzzo then said to him as to how she had been hurt. This was objected to by Mr. Ball, counsel for defendant, as not part of the *res gestae*; and not being a dying declaration, was inadmissible. The Deputy-Attorney General stated that the testimony was offered as part of the *res gestae*.

PENNEWILL, J.:—We think it is not admissible

*Petro Ferano*, a witness sworn on behalf of the State, testified that on the night of the shooting the first he knew of the trouble was that while he was sleeping, downstairs, Mike, the prisoner, called him from upstairs, saying "Uncle Peter, Uncle Peter, light the lamp because I have got to come downstairs." The witness continued: "I got up with my night-clothes on and I lighted the lamp, and then Mike came down and I heard his wife and his children hollering, and I said to Mike 'What is the trouble?' Mike said, 'Keep quiet, Peter. I was cleaning the revolver and the shot went off and I hit my wife in her hand and now I am going for the doctor,' and he got his coat and went out. So I

left the lamp downstairs and I ran upstairs because she was hollering 'Uncle Peter, Uncle Peter.' She lay on the bed and I said 'What is the matter?'"

Ball for the defendant here interrupted with an objection to the witness' stating anything that the deceased said as to the cause of the injury, there being no evidence as to the time that elapsed between the firing of the revolver and the time the witness went upstairs; that such testimony was not admissible therefore as part of the *res gestae*.

The witness then testified that he did not know how long it was from the time the deceased was hurt until he went upstairs, because he never heard the report of the revolver, but that it may have been five or ten minutes. The witness further stated that it was somewhere around five or ten minutes from the time he went upstairs to the room of the deceased until Destafano came up there. The witness was then asked: "What did this woman say to you when you went into that room?"

(Objected to by counsel for defendant as not part of the *res gestae*.)

PENNEWILL, J.:—We think it is too uncertain and vague as to what time had elapsed between the shooting and the conversation that you seek to introduce, and that the question is not admissible.

Q. Did she say whether or not she had been shot?

(Objected to by counsel for prisoner on the same ground as before stated.)

PENNEWILL, J.:—We sustain the objection.

*Alexander Patella*, being sworn as a witness on behalf of the defendant, testified that at the time they took the deceased away and put her in the ambulance, she said to the witness "Godfather, they are going to take me away; I am going to die. You take care of my children." The witness was then asked the following question: "After she said to you she was going to die and showed the wound, what did you say then to her about how it happened or anything of that kind?"

(Objected to by the Deputy Attorney-General, because suf-

ficient facts had not been shown to admit the statement as a dying declaration.)

PENNEWILL, J.:—We think, taking into consideration all this testimony, that whatever she may have said was in contemplation of impending death and under the belief that she would die. We therefore hold that the question is admissible.

A. I asked her what was the trouble and how this happened, and she said that "Mickele was turning the revolver and the shot went off and hit me, and it was an accident."

Q. What else did she say to you about this shooting just before being taken to the ambulance? A. She said: "Godfather, Mike is not at fault, and I want him not to be arrested and to take care of the children."

(The above answer is objected to by the Deputy Attorney-General and motion is made to strike it out, on the ground that it is immaterial and states a conclusion of law.)

PENNEWILL, J.:—We think that part of the answer which refers to her desire not to have the defendant arrested and to take care of her children should be stricken out, but the part in which she says that it was not the defendant's fault should remain in.

The witness *Giocondina Patella*, being produced on behalf of the defendant, testified that she saw Kathrina A. Uzzo, the wife of the defendant, in the front room shortly after the shooting, when she said to the witness: "I feel like dying any moment," and then showed witness the wound, and when asked how it happened, she said, "Godmother, it was an accident. Mike was turning his revolver and the shot went off and hit me."

The State in rebuttal recalled the witness Peter Ferano and asked the following question: "After you got upstairs where Mrs. Uzzo was, how soon was it before Godmother Giacondina Patella came in?" A. I had no time-piece in my hand, but five or ten minutes.

Q. Did Kathrina A. Uzzo say anything to you about whether or not she was going to die? A. No sir.

Q. What was it this woman said to you?

Objected to by Mr. Ball, counsel for defendant, as inadmissible, not being a dying declaration. Hastings, Deputy Attorney-General, stated that the testimony was admissible, being offered for the purpose of contradicting the dying declaration already put in evidence on behalf of the defendant; citing *State vs. Lodge*, 9 *Houst.* 542.

PENNEWILL, J.:—The defendant put in the dying declaration of the deceased, and as she is not here for the purpose of cross-examination, in the place of that the State can contradict it by statements which she made about the same time. It was done in the Fleetwood case. We overrule the objection.

A. I went upstairs in the room and the woman was lying on the bed, and she said "Uncle Peter; Uncle Peter; he killed me; he killed me."

During the introduction of testimony on behalf of the defendant, six witnesses were asked by defendant's counsel what, if anything, the wife of the defendant said to them as to how the shot occurred, to which the reply was uniformly made that Mike was not at fault at all and that the shot went off accidentally.

A seventh witness being called by defendant's counsel and asked the same question, the Deputy Attorney-General objected on the ground that under the rule of Court only six witnesses were allowed to testify upon the same point. Ball, for defendant, contended that while such might be the rule in certain cases, as for instance upon the point of character, yet such a rule was never laid down in a murder case; that where a man was being tried for his life the widest latitude should be and is given by all Courts, in the matter of evidence.

PENNEWILL, J.:—We know of no distinction having been made in this regard between murder cases and other cases. There must be some limit when it is the identical question, and we think the rule should be enforced in this as in any other case. We sustain the objection.

PENNEWILL, J., charging the jury:

Gentlemen of the jury:—The prisoner, Mickele Uzzo, is charged in this indictment with the crime of murder of the first degree. It is claimed by the State that the defendant, on December 8, 1906, at his home in this City, wilfully and maliciously shot Kathrina A. Uzzo, his wife, with a pistol, thereby causing her death and committing the crime of murder. It is claimed by the defendant that the killing of his wife was not unlawful but entirely accidental.

Under this indictment you may find any one of four verdicts, as the evidence shall warrant: Murder of the first degree, as charged in the indictment;· murder of the second degree; manslaughter; or not guilty.

Murder of the first degree is where the crime is committed with express malice aforethought. Express malice may be defined to be, where one person kills another with a sedate, deliberate mind and formed design; which formed design to kill may be manifested in many ways,.as for instance by lying in wait for the deceased, by antecedent menaces or threats, by former ill-will, secret enmity or sullen malevolence towards the deceased, or by any other circumstances calculated to disclose the inward fatal purpose or intention of the accused towards his victim. If a design or intention to take life be but the conception of a moment, it is sufficient. If the slayer had time for thought and thinking but for a moment, did intend to kill, and in fact did kill, it is just the same in legal contemplation as if he had intended it for a length of time, and killing under such circumstances is held to be both deliberate and premeditated.

In order, therefore, to find a verdict of murder of the first degree, you must be satisfied that the prisoner killed the deceased with express malice aforethought, that is, with a sedate, deliberate mind and formed design to kill.

Murder of the second degree is where the crime is committed with implied malice; that is, where the malice is not express, as in murder of the first degree, but is an inference or conclusion of law from facts actually proved. It is where there is no deliberate mind or formed design to take life, but where the kill-

ing was done without justification or excuse and without provocation, or without sufficient provocation to reduce the offense to manslaughter. For example, where the killing was committed without design and premeditation, but under the influence of a wicked and depraved heart, or with a cruel and wicked indifference to human life, the law implies malice and makes the offense murder of the second degree.

In order, therefore, to find a verdict of murder of the second degree, you must be satisfied that the prisoner killed the deceased with implied malice.

Malice, however, is implied by law from every unlawful and cruel act committed by one person against another, however sudden that may be; for the law considers that he who does an unlawful and cruel act voluntarily, does it maliciously. If death ensues from an unlawful and cruel act of violence on the part of the slayer, in the absence of adequate or sufficient provocation, the law implies that such act was done maliciously, and the crime is murder of the second degree.

Malice is an essential element of the crime charged in this indictment, and must be proved just as any other material element of the charge. Without malice there can be no murder.

Where the killing is shown to have been done with a deadly weapon, such as a pistol, it is presumed to have been done maliciously, in the absence of evidence to the contrary, and the burden of showing the contrary is on the accused, for the usual and probable consequences of the act are presumed in law to have been intended by the person using the deadly weapon. If death is produced by the use of a deadly weapon, great must be the provocation to reduce the killing from murder to manslaughter.

Manslaughter is where one person unlawfully kills another without malice. For example, where one in a sudden affray, in the heat of blood, or in a transport of passion, inflicts a mortal wound, without time for reflection or for the passions to cool. In order to reduce the crime to manslaughter the provocation must be very great—so great as to produce such a transport of passion as to render the person for the time being deaf to the

voice of reason.  While murder proceeds from a wicked and depraved spirit and is characterized by malice, manslaughter results not from malice but from unpremeditated and unreflecting passion.

Dying declarations are entitled to the same consideration from the jury, and should be given the same weight and credit, whether in favor of the State or the defendant.

In every criminal prosecution the defendant is presumed to be innocent until his guilt is proved to the satisfaction of the jury beyond a reasonable doubt.  If, after carefully and conscientiously considering and weighing all the evidence in the case, you should entertain a reasonable doubt of the guilt of the prisoner, you should give him the benefit of such doubt and your verdict should be not guilty.  But such a doubt must not be a mere fanciful, vague, speculative or possible doubt, but a reasonable, substantial doubt remaining in your minds after a careful consideration of all of the evidence; and such a doubt as reasonable, fair-minded and conscientious men would entertain under all the facts and circumstances of the case as shown by the evidence.

Now, gentlemen, if you should believe from the evidence that the defendant killed his wife with express malice aforethought—that is, with a sedate, deliberate mind and formed design to kill, your verdict should be guilty in manner and form as he stands indicted; namely, of murder of the first degree.  If you should believe that the defendant killed his wife, not with express malice, but with implied malice; that is, not with a deliberate mind and formed design to kill, but with a wicked and depraved heart and with a cruel and wicked indifference to human life, your verdict should be guilty of murder of the second degree.  If you should believe that the defendant killed his wife unlawfully, but without malice express or implied, your verdict should be guilty of manslaughter.

If you should not be satisfied beyond a reasonable doubt that the defendant killed his wife maliciously or unlawfully, your verdict should be not guilty.

Verdict, not guilty