JAMES S. GARNER, Defendant Below, Appellant, v. THE STATE OF DELAWARE, Plaintiff Below, Appellee.

(*October* 8, 1958.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*Henry A. Wise, Jr.*, and *Edmund D. Lyons* for appellant.

*Joseph Donald Craven*, Attorney-General, and *Alexander Greenfeld*, Deputy Attorney-General, for the State.

Supreme Court of the State of Delaware, No. 14, 1958.

SOUTHERLAND, C. J.:

At about midnight on Saturday, November 28, 1953, the body of Samuel P. Chicadel, a plumber by trade and a part-time taxi driver for the City Cab Company, was discovered on

the grounds of the Ferris Industrial School in New Castle County. He had been stabbed to death, and his wallet was missing.

No arrest immediately followed, but early in 1957 further police investigation resulted on March 4, 1957, in the indictment of James B. Garner and Theodric Thompson for the murder.

A severance was finally ordered and separate trials were had. Garner, the appellant here, was found guilty of murder in the first degree, with a recommendation of mercy. He appeals.

Two questions are raised:

1. *Is the evidence sufficient to justify the verdict?*

The evidence consisted of (1) certain statements, not amounting to a confession, made by Garner at a time when he was serving a term of imprisonment for another crime; and (2) a train of circumstances tending to implicate him in the murder.

The following statement of facts is drawn from both sources. The State's evidence, viewed in the light most favorable to the prosecution, made the following case:

Garner and Thompson lived in Millside, a housing development a short distance south of the Wilmington city line. Thompson lived with Madeline Massey in a three-room apartment. Garner lived nearby. The two men seem to have been close friends; Garner visited Thompson nearly every day. Sometimes they would go out together.

On the evening of November 28, 1953, the two men were with Madeline Massey in her apartment. Madeline left home about nine o'clock. Some time later the two men left the apartment. Their purpose was to go to the east side of Wilmington and rob someone. Thompson had a knife.

At about 10:45 p. m. of the same evening two colored men walked into a beer garden at Eighth and Church Streets, on the

extreme east side of Wilmington. They asked Stanley Mosiej, a customer, if there was a telephone in the place. He told them that there was not; that the nearest telephone was at Eighth and Spruce Streets. Spruce Street is one block west of Church Street. One of the men was Garner. At this point Stanley Kucharski, the bartender, who had been in the men's room, re-entered the saloon and started to wipe off the tables. He noticed the two colored men. One was talking to Mosiej and the other was standing behind Mosiej leaning on the door. When Kucharski came forward the two men went out. Kucharski inquired of Mosiej what the men wanted and Mosiej told him and said he had told the men to go up Eighth Street. Kucharski saw them pass the window of the saloon going south on Church Street, instead of west on Eighth Street. Suspicious, Kucharski walked to the door and saw the two men cross Church Street and start "tackling" a man lying on the steps of a house. He shouted to them to "get the hell away from there" and they ran south on Church Street, turned the corner, and went west on Seventh Street.

Some time between eleven and eleven thirty o'clock Miss Betty Reider was at her home at 715 Bennett Street. That street runs north from Seventh Street parallel to Church Street, half-way between Church and Spruce Streets, and is thus a short block west of Church Street. She heard her friend, Ruhl Reider, call: "Betty, Betty, Betty". She ran to the front door and said, "What's the matter?" She could not at first see Ruhl. Then she saw that he was under a car, that is, with his feet pushed under a car, and that two men were bent over him. When she came out the men ran.

Garner and Thompson hailed a taxicab. At 11:20 or 11.25 p. m. Mrs. Ann McGonigle, switchboard operator of the City Cab Company, overheard a report from Chickadel, whose voice she at once recognized, that "he had a pickup going out Lancaster Avenue". She knew that just prior to this report he had dropped "a steady order", i. e., a regular order from a person

who "rode all the time". That passenger was dropped "on the east side".

We go now to the scene of the crime. The Ferris Industrial School, a reformatory institution for young offenders, is situated on the Centre (sometimes called the Ferris) Road, and is bounded on the west by the Faulkland Road. A car leaving the east side of Wilmington has a convenient and direct route to the Centre Road by way of Lancaster Avenue and the Lancaster Pike.

Two driveways (called the north and south driveways) lead from the Centre Road to the various buildings of the institution, distant several hundred feet from the road.

At about 11:45 p. m. Monsees Cohen, a night supervisor, while looking out of a window in one of the buildings, heard another employee, Hunton, call to him that something wrong was going on outside. Cohen crossed to a window overlooking the south driveway. He saw a taxicab, and heard "some little commotion" in the cab. A little later he saw two men get out of the cab and walk toward a tree on the lawn. They walked slowly, as though "something was interrupting the progress". When they reached the tree Cohen heard "a malicious sound"—"like some-one butchering a pig". The two men walked back to the cab, closed the doors, and "disappeared" in the grounds.

Robert Shortall, Athletic Director of the School, was told by Hunton that something unusual had happened. They went to the cab and saw the telephone was torn out. They notified the State Police and at the suggestion of the latter again went back to the cab. On the way they discovered the body of the driver. They saw blood on his chest, and there was no sign of life. The autopsy the following morning disclosed a stab wound in the chest which had passed through the heart, causing death, a stab wound in the back and a deep cut in the scalp. The State Police were notified and arrived at the Ferris School grounds at 12:27 a. m. The cab was standing about 162 feet from the Centre Road.

At about ten minutes before twelve Mrs. Shirley Furst was driving with her husband along the Centre Road in a southwesterly direction and was passing the Ferris School. As they passed the south driveway she saw the cab. As their car neared the intersection of Centre and Faulkland Roads two men jumped from the Ferris School grounds to the Centre Road. After first seeing the men while the car was passing them, Mrs. Furst turned and looked at them again, because she thought that they might be two boys running away from the school. By that time the two men had reached the intersection. They were light-skinned Negroes, wearing long coats.

To the southwest, a short distance from the Ferris School, is a development known as Willow Run. South of Willow Run are the grounds of the Veterans Hospital, fronting on the Robert Kirkwood Highway, a main artery of traffic leading west and southwest from Wilmington to Newark by way of Price's Corner. From the intersection of the Centre and Faulkland Roads to the Kirkwood Highway is somewhat more than half a mile. One walking through Willow Run to the highway would have a direct route through Montgomery Road, a street to the rear of the hospital grounds, and rather more than a quarter of a mile from the Centre-Faulkland intersection. A police search of the terrain in Willow Run resulted in the finding, three and four days later, of the personal effects of the murdered man. His driver's license, registration card, a family photograph, and some receipts and other papers were found in a sewer at a point between 1704 and 1706 Montgomery Road. His wallet, scapular, crucifix, Social Security card, and other family photographs were found on the back lot of 1712-1714 Montgomery Road. All these articles were identified as Chickadel's by his widow.

On the night of the murder Miss Vera Basalone was a passenger on a bus traveling from Wilmington to Price's Corner on the Kirkwood Highway. The bus had left Fourth and French Streets in Wilmington at 11:45 p. m. At about 12:15 a. m. the bus stopped at an intersection a short distance east of the hospital grounds to discharge a passenger. As the driver pulled

away Miss Basalone saw two men running for the bus. She asked the driver, John P. Minner, who was a friend of hers, to stop for them. He did so and picked them up between intersections. They were colored men. When the bus stopped at Price's Corner (about a mile further west) a bus bound for Wilmington (the opposite direction) was stopped on the other side of the road. The men said: "There's our bus", and jumped up and ran to the front. They paid the fare with a quarter; they appeared to be in a hurry, and did not wait for the change of one cent.

Madeline Massey returned to her apartment shortly before midnight. She looked at the television and fell asleep. Some time later ("almost one, I imagine") she was awakened by the entrance of Garner and Thompson returning to the apartment. The television light was on, but there was no picture. The men went into the kitchen and closed the door. After two or three minutes Garner came out and left the apartment. Madeline went into the kitchen. She noticed that Thompson had blood on his hand, and there was blood on the pocket of his overcoat. The next day she noticed blood on another part of his clothing.

At about eleven o'clock on the morning of November 29 (eleven hours after the murder) the taxicab was examined for fingerprints at the garage of Troop II of the State Police. A large number of "lifts" (i. e. reproductions) of prints were made.

On January 30, 1957, Garner, then serving a sentence in prison, was brought to State Police Headquarters and questioned. In the course of the questioning he made certain statements concerning the plan of robbery that he and Thompson had embarked upon on the evening of the murder, and made a statement concerning his movements that night. He admitted that they hailed a taxicab and rode as far as Fifth and Washington Streets, where he said they separated. He said that later he met Thompson "accidentally" and that they returned to Millside together.

On the day of the questioning, January 30, 1957, Garner's fingerprints were taken. One of the lifts from the cab, taken

from the right rear door handle, was proved by a fingerprint expert from the F.B.I. to be a partial print of Garner's right-hand little finger.

The foregoing is a detailed summary of the State's case. Beyond reasonable doubt, the murderers were the two men whom Mrs. Furst saw leaving the Ferris grounds at midnight and who walked through Willow Run and disposed of Chickadel's wallet and its contents. And the jury could well find that the same men hurriedly caught a bus on the Kirkwood Highway driving *away* from Wilmington and then—still in a hurry —caught another bus back to Wilmington. It would stretch coincidence too far to suppose that two Negroes of their description, at just that time and place on the Kirkwood Highway, returned to Wilmington in that manner.

The other evidence strongly points to Garner and Thompson as the two men, and satisfactorily identifies Garner.

Garner admits that he and Thompson set out on that evening on an errand of assault and robbery. They made two— perhaps three—unsuccessful attempts. Garner admits the visit to the taproom, where he was identified. The circumstances suggests the correctness of the bartender's suspicion that when they entered the taproom they were up to no good. Garner also admits another attempt. The Church Street attempt was seen by the bartender, and the Bennett Street attempt occurred nearby, at a time shortly after the previous attempt. Miss Reider could not fix the time accurately, but a reading of all of her testimony —not merely the single answer ("probably" nearer eleven-thirty) that counsel seeks to excerpt from the context—suggests that it was nearer eleven. At all events the evidence of the Bennett Street episode was admissible for such weight as the jury might give it.

Garner admits that after an unsuccessful attempt at robbery the two men, then on the east side, hailed a taxicab. The time of this occurrence was just after Chickadel had dropped a regular customer on the east side and was cruising or returning

to his stand, as appears from the evidence of the switchboard operator. It must have been Chickadel's cab, for Garner's fingerprint was found on the right rear door handle. The suggestion that Garner's print might have been left on the handle during a previous trip is, as the fingerprint expert testified, highly improbable. If so, it would naturally have been obliterated by prints of other passengers. The jury evidently rejected the explanation.

Another suggestion that the whereabouts of the cab are unaccounted for for several hours is answered by its possession in the morning by the State Police. The presumption is that they did their obvious duty and impounded the cab. And we cannot understand what use Garner seeks to make of the point. Surely it cannot be reasonably suggested that Garner somehow got into the cab during those hours.

The jury was warranted in finding that the fingerprint showed Garner's presence in the cab on the eve of the murder.

█ After the men entered the cab it was directed to Lancaster Avenue—not to Fifth and Washington Streets, as Garner said. Some point is sought to be made of a claim of discrepancy in time between the time of the Bennett Street attempt and the time of Chickadel's report to the dispatcher at 11:20 or 11:25 p. m. This point is based upon the assumption that Chicadel was actually on Lancaster Avenue when he reported to the dispatcher. The assumption is not justified; the operator said she did not know where he was when he called. Moreover, it is common knowledge that a taxi driver often reports his destination promptly after picking up a fare, since knowledge of the future movement of the cab is useful to the dispatcher. The words "a pickup going out Lancaster Avenue" naturally import the destination—not the momentary place of the call.

The suggestion that Garner might have left the cab at Fifth and Washington Streets and made the fingerprint on leaving the car is highly far-fetched. It requires one of two other sup-

positions: (1) that Thompson continued on in the cab and on the way picked up another acquaintance of Garner's description, who joined him in committing the crime, and that Thompson later met Garner "accidentally" before returning to Millside; or (2) that both men left the cab and that another two men of their description thereafter hailed it and directed it to the Ferris School. Chickadel did not report to his dispatcher again. Either supposition borders on the fanciful. Certainly a jury could reasonably reject them.

The two men returned to Millside together. Thompson had blood on his hand and clothing. The time of their return—after the television picture had gone off and probably around one o'clock—is consistent with the time of the murder, the time required to walk through Willow Run and dispose of the wallet and contents, the time to walk to Kirkwood Highway, and the time required for the travel on the two buses and for the return to Millside.

The episodes of the evening are closely linked together by the sequence of times and places. Taken in connection with the fingerprint, they form a strong and convincing chain of evidence. The jury was fully justified, in our opinion, in finding that the evidence was inconsistent with any rational conclusion except that of Garner's guilt.

Defendant asserts that much of this evidence was irrelevant. The method of attack is to take each item and consider it apart from the rest, and to argue that it in itself proves little or nothing. Thus, it is said that neither of the men was identified by Miss Reider or by Mrs. Furst. The Bennett Street episode we have already dealt with. As to Mrs. Furst's testimony, it was directly relevant to prove the general description of the men and the route followed by them after the crime.

It is said that Miss Masalone could not say that the two men were colored. She said that they were "fair-complexioned" and Minner said they were colored.

Again, it is said that the personal effects of the victim were not connected with the defendant Garner. This ignores the other evidence. Garner's participation in the crime is proved. And obviously the evidence was relevant to show motive and to show the route followed by the guilty men after the crime.

As we have said, the chain of evidence must be viewed as a whole. Its effect cannot be destroyed by the piecemeal method adopted by Garner's counsel.

Some point is sought to be made of Garner's coat. It was a three-quarter coat; whereas Mrs. Furst testified that the men were wearing long coats. It is a minor discrepancy, easily attributable to a faulty impression received during a short look at the men.

A legal objection is made to the admission of Garner's statement to the police.

Garner was taken from prison to police headquarters about 11:00 a. m. on January 30, 1957. He was questioned at various times on January 30, taken back to prison, and questioned an hour and fifteen minutes the next morning. At four o'clock on January 31 he was taken before a magistrate and arraigned.

It is said that the failure of the police to bring him before a magistrate within twenty-four hours was a violation of the applicable criminal rule and of the statute.

Rule 5(a) of the Rules of Criminal Procedure, *Del. C. Ann.*, provides:

"An officer making an arrest with or without a warrant or any other authorized peace officer shall take the arrested person without unreasonable delay before either the nearest available Justice of the Peace of the county in which the offense is alleged to have been committed or before the court out of which the warrant issued, in accordance with the command of the warrant. When an arrest is made without a warrant, a complaint shall be

made as soon as the accused is brought before a committing magistrate."

This rule contemplates an "arrest", *i.e.*, a restraint of liberty. It does not apply to a case in which the defendant is already in custody. See *United States v. Carignan,* 342 *U. S.* 36, 72 *S. Ct.* 97, 96 *L. Ed.* 48; and *cf. United States v. Gray, D. C.,* 87 F. Supp. 436. It has also been held that if the defendant is in prison serving a sentence it is unnecessary to give him a preliminary hearing prior to indictment. *Yodock v. U. S., D. C.,* 97 *F. Supp.* 307.

11 *Del. C.* § 1911 provides:

"If not otherwise released, every person arrested shall be brought before a magistrate without unreasonable delay, and in any event he shall, if possible, be so brought within 24 hours of arrest, Sundays and holidays excluded, unless a Resident Judge of the county where he is detained or of the county where the crime was committed for good cause shown orders that he be held for a further period of not exceeding 48 hours."

The same comment is applicable to the statute. It contemplates an arrest.

The rule and the statute have no application to the case.

For the reasons above stated, we hold that the evidence was amply sufficient to sustain the verdict.

2. *Was appellant deprived of his constitutional right to a speedy trial, in violation of Art. I, Sec. 7 of our constitution, Del. C. Ann.?*

On March 4, 1957, Garner and Thompson were jointly indicted. On March 8 the case was continued in order that counsel might be appointed. On March 20, 1957, the court appointed counsel for both defendants. On March 22, the Court appointed Henry A. Wise, Jr. and Edmund D. Lyons as counsel for Garner, and on April 1 appointed other counsel for Thompson. On April 5 Mr. Wise accepted the appointment. At the May Term Thomp-

son's counsel moved for a continuance. Garner's counsel objected and asked for a speedy trial. At that time a joint trial was contemplated. Thompson's motion was granted and the case was continued to the September Term (the next term), presumably to protect his right to sufficient time to prepare his case. Necessarily, Garner's trial was also postponed.

Later in May Garner moved for a severance. This motion was, of course, addressed to the sound discretion of the trial court. Ordinarily, defendants indicted jointly as principals should be tried together, but the court may, if justice requires it, grant separate trials. 23 *C. J. S. Criminal Law* §§ 933-934. The motion was heard a few days later and was denied. The order of continuance to the September Term was vacated, and the motion for a speedy trial was granted. The case was set for trial on July 29. This date, we gather, was not objected to by Garner.

On June 4 a motion by Thompson to produce certain property of himself or his codefendant was filed, was briefed and argued, and was decided July 25.

On July 2 the court granted Garner's previous motion for a severance subject to a further hearing on July 8. On that day the order of severance was stricken and September 10 was fixed as the date of trial over Garner's objection. Thompson's motion to produce was then pending and undecided. During July and the early part of August other motions on behalf of Thompson were heard and disposed of.

On September 3 there was a pre-trial conference. On September 10 the court again granted Garner's motion for a severance and permitted the Attorney General to elect which defendant he would first try. Thompson was tried September 10 to 14 and was convicted.

On September 20 the calendar was called and Garner's trial fixed for October 7. He was tried October 8 to 10.

· These facts entirely fail to show unwarranted delay on the part of the State in bringing Garner to trial. The first continuance was necessitated by the application of his co-defendant. Obviously, Thompson's right to sufficient time to prepare his case had to be protected. Nevertheless, the court vacated on July 8 the continuance and set July 29 for the joint trial. The further continuance obviously resulted from the necessity of hearing and disposing of Thompson's later motions. Garner's insistence on a separate trial was finally acceded to, and the postponement from September 10 to October 7 was the result of the severance.

It must not be overlooked that at the time these cases were tried they were capital offenses, and a bench of three judges was required. Because of the pressure of other business such a case cannot be tried immediately.

But the important point here is that we find no evidence that the State delayed the trial. Practically all of the delay was caused by motions of one or both of the two defendants, and the court was faced with the necessity of doing justice to both defendants. It had to deal not only with Thompson's motion for further time, but also with Garner's request for a severance. The matter of severance was within the court's discretion, and Garner does not suggest any abuse of discretion. He merely claims that the length of time itself compels the conclusion that he was denied a speedy trial. This does not follow. The right to a speedy trial is necessarily relative; it is consistent with delays and depends on the circumstances. 22 *C. J. S. Criminal Law* § 467, p. 715. The cases cited by Garner are so clearly distinguishable that no detailed analysis of them is required. In *State v. Arkle*, 76 *Mont.* 81, 245 *P.* 526, the defendant was charged in March and the court refused to call the regular jury for the trial of cases in May. *People v. Molinari*, 23 *Cal. App. Supp.* 2d 761, 67 *P.* 2d 767, involved the violation of a statute requiring a trial in thirty days' time in a justice's court. In *Culver v. State*, 11 *Okl. Cr.* 4, 141 *P.* 26, the delay was attributable to the State. In *Von Feldstein v. State*, 17 *Ariz.* 245, 150 *P.*

235, no excuse was shown by the State for failure to try the defendant within 60 days, as required by statute. In *People v. Grandstaff*, 324 *Ill.* 70, 154 *N.E.* 448, no reason was shown by the State for delay beyond the statutory period. No case is cited to us holding that delay incident to the consideration and decision of a defendant's motions is attributable to the State or can be used as a basis of a claim that defendant has been denied a speedy trial.

Garner also bases an argument on 10 *Del. C.* § 6910, requiring trial at not later than the second term. If the delay is attributable to the State, the defendant is entitled to discharge, though not to a dismissal of the indictment. *Galliao v. State*, 7 *Boyce* 488, 108 *A.* 279; *State v. Walker*, 9 *Terry* (48 *Del.*) 190, 100 *A.* 2d 413. The same reasoning applicable to the constitutional provision is *a fortiori* applicable to the statute. The delay must be attributable to the State before the defendant can complain.

We find no denial of Garner's constitutional or statutory rights.

We have carefully considered the record in this case and all of counsel's arguments.

We are satisfied that the verdict must stand.

The judgment of the Superior Court is affirmed.