# COURT OF OYER AND TERMINER,

——————

THE STATE *v.* JOHN K. LODGE.

*Abortion—Murder of Second Degree—Dying Declarations—Reputation.*

In the trial of homicidal cases, previous statements of a deceased party tending to contradict her dying declarations are admissible in evidence.

The State cannot introduce evidence as to the accused's general reputation, unless the accused first puts his character in issue.

Death produced by the procuring or attempt to procure the miscarriage of a pregnant woman, unless the same be necessary to preserve her life, is murder of the second degree. The assent of the pregnant woman is no defence.

(*Sussex, January 29, 1892.*)

INDICTMENT for murder of the second degree for the felonious killing of Martha I. Evans, a white married woman, in Indian River Hundred in said County, in the month of July, 1891.

The evidence adduced was entirely circumstantial, and tended to show that deceased came to her death by reason of an operation to produce abortion, which said operation the State contended was performed by the prisoner.

*John Biggs*, Attorney General, and *Thomas Davis*, Deputy Attorney General, for the State.

*Alfred P. Robinson*, and *Robert C. White*, for the prisoner.

In the progress of the trial, Robinson, for the defendant,

called Patience Johnson to the stand and asked witness the following question :

" When Mrs. Evans got into the carriage after she returned from behind the house on that Saturday with Mr. Lodge, and you had both left, did she say to you that all Mr. Lodge did was to give her a box of pills ?"

*Biggs*, Attorney General, objected to the question on the ground that it was hearsay testimony and also that it was not in the nature of a dying declaration.

Counsel for defendant contended that if the deceased were present as a witness for the State, the Attorney General would not deny that he could cross-examine her as to these statements. He argued that it had been ruled in the courts of other States that as the prisoner is deprived of the presence of the witness and has not the opportunity to cross-examine, some ruling is made in favor of life and liberty, and not all in favor of the State and the presumption of gilt. That dying declarations stand on the same footing as any other testimony and are not to be taken as conclusive. 1 *Houston's Criminal Cases, State v. Frazer*, 184 ; 1 *Bishop on Criminal Proceedure*, Section 1209. (Which cases referred to admission of conversations prior to dying declarations, contradicting the dying declarations); 21 *California Reports*, 371—*People v. Lawrence;* 74th *Georgia Reports*, 104 ; 23 *Texas Reports*, 488.

The Attorney General replied that the case cited in 1 *Houston's Criminal Reports*, 184, did not apply to the present case ; and that there had never been to his knowledge a case in this State that had gone anywhere near as far as what was proposed by Mr. Robinson ; that he would admit that if counsel could show that this witness did not say what was testified here she did say as a dying declaration, it would be competent testimony.

CULLEN, J.: Suppose a witness is called to the stand here and swears to a certain state of facts ; could you contradict that witness by proving that that witness had made declarations to the contrary, unless the attention of the witness were called to it ?

*Robinson,* for the defendant :   Very clearly not.

CULLEN, J. :   I call your attention to this because this is a very important matter.   In this case the dying declarations under the law are presumed to be under the sanctity of an oath—it is equivalent to that.   If you can admit statements prior to those without an opportunity of the party's attention being called to them, it seems to me that it makes a direct innovation of our practice.

GRUBB, J. :   I want to get the exact bearings of the question —I am not expressing an opinion.

Dying declarations are admitted in homicide cases, because the parties are apprehensive of impending death, and there is the prospect of almost immediate dissolution, on the ground that as they are about to enter the presence of their Maker, it is supposed that they will not dare to deceive any more than when they invoke the attention of their Creator to the oath when made, so that the fact of their coming dissolution is considered to be quite as binding as the taking of an oath in its obligation upon them.   The objection made always is that the accused is deprived of the opportunity of calling the attention of the person who supposed himself to be about to die to certain facts, which, if brought to his attention, he might modify his statement or make none at all ; that there is no opportunity to test his judgment, the strength of his recollection or his bias.

But the law says that it insures justice in the greater number of cases and that it is necessary to let it in, although it does deprive the defendant of testing the memory of the witness and his truthfulness by cross-examination.   Then it is as though it says, " Very well, if you are deprived of that opportunity of ascertaining if that witness was wrong and of bringing any witness to contradict him, when we let in the dying declarations, without an oath,—you ought to have the right to put in testimony of previous declarations, without laying the ground."   In other words, the party on one hand says, " If you let in the dying declarations, I ought to have the right to contradict them (aside from the rule that I am bound to

lay the ground for a contradiction) by proof of a previous conversation. And so the two, according to Judge Field and these other authorities, seem to balance each other; and where there is a balance the law leans in favor of human life or personal liberty. That is just the situation.

Now the question is, where there is a loss of cross-examination on the side of the defence and also by the State, in that you have not laid the ground, whether the favor of the law should not be on the side of liberty and life, and should let in the previous statements that are contradictory of the statements made by the person who supposed she was dying. Therefore, as dying declarations are admitted on the ground of necessity, ought not proof of contradictory or inconsistent statements by the deceased to be also admitted on the same ground?

HOUSTON, J.: In order to get on with the trial of this case, let us dispose of the question now before us. Although it is fair to say (that counsel and the jury may know) that the Court have some doubt on this question, yet the inclination of the mind of the majority of the Court is that the testimony may be contradicted in the mode proposed, and that therefore the question is admissible.

Thereupon the testimony offered was admitted in evidence.

CULLEN, J., dissented.

John Manning having been produced and sworn on the part of the State, the Attorney General interrogated him as follows:

"Did you ever have any conversation with him about an operation that he performed on any one to produce a mis-carriage?"

Mr. Robinson: I object to the question. You can never bring the reputation of a prisoner into a case of this kind, unless he brings it in himself.

The Attorney General contended that he should be allowed to show that the witness had a conversation with the defendant about the latter's performing this kind of an operation upon some one else,

as showing that he was engaged in this business, citing in support of his contention, 3 Greenleaf on Evidence, Sec. 15, American and English Encyclopedia of Law, Vol. 1, page 31.

*Mr. Robinson,* in reply, cited American and English Encyclopedia of Law, Vol. 1, page 31, and argued that this evidence must be brought home to Mrs. Evans before it can be admissible.

GRUBB, J.: We are of the unanimous opinion that this testimony is not admissible. This subject came up in that professional thief case (*The State v. Carter et al., Houston's Criminal Reports,* 406). There such testimony was held to be inadmissible, unless the prisoner's character was put in. We therefore rule it out.

CULLEN, J.: This man is indicted for one offense; I don't care what his past character is, whether a murderer or not. The matters in evidence here must be germane to the issue. You propose to prove past character or his reputation. That has nothing to do with the guilt or innocence of the person. As I view this matter, the question here is, Is this man guilty under the Act of Assembly of the commission of this offence with which he is charged?

HOUSTON, J.: He has not himself put his character in issue nor has testimony been adduced on the other side to show anything by which we could infer that his intention is to put his character in issue, and therefore I do not think this evidence is admissible.

GRUBB, J., charging the jury :

*Gentlemen of the Jury* : I will preface the charge of the Court to you by saying that we realize the great service which you are rendering to this community in being here, as you have been, for the past three days, with several of the members of your body suffering from great illness ; and we therefore congratulate you that you have reached, as we hope, very near the conclusion of your arduous and valuable labors. The case which you are called upon to try in this instance is no ordinary one ; in fact, it is a most serious case, in its own circumstances, as well as in its importance to

the community. This case, gentlemen, seems to be unprecedented in the annals of the criminal jurisprudence of this State, so far as as I know, and, so far as I have been able to learn from my associates; for even our venerable brother, Judge Houston, (who has been upon the bench for more than thirty-five years and who has lived beyond his three-score years and ten) does not remember any instance in this State in which any man has been charged, as this man is, with murder of the second degree (or perhaps with any other crime) for the commission of the act for which he stands accused—so that this is to all intents and purposes a new question, and therefore a question of great importance to this community; and it is of the greatest importance that you should give it your most serious, intelligent and conscientious consideration, before you decide it.

Gentlemen, you will remember that you are sworn to try this case and to render a verdict according to the evidence, and that this means, not what you may have heard outside this jury box, not what may be the sentiments of the communities from which you come, respectively, but it means the legal evidence that this Court has decided is admissible in this case from the mouths of the witnesses (and from them only) who have been before you, and that you must exclude all other considerations, all other impressions, and be governed entirely by the evidence which has been submitted to you from that witness stand with the consent of the Court after opportunity has been afforded counsel to object to any that was unadmissible.

John K. Lodge, the prisoner at the bar, stands charged in this indictment with murder of the second degree for the felonious killing of Martha I. Evans in the month of July, 1891, at Indian River Hundred within this County.

As the prisoner stands charged with murder of the second degree, it becomes necessary for the jury to be sufficiently informed as to the distinctions between murder and the inferior grades of homicide (or man-slaying and also woman-slaying), and particularly as to the definition and nature of murder of the second degree.

Homicide is the killing of any human creature, and is of three kinds: Justifiable, excusable and felonious. The taking of human life is held to be justifiable when done in the execution of public justice, as where the proper public officer duly executes a criminal under lawful sentence of death, or in the advancement of public justice, when a public officer of necessity in the due execution of his office kills a person who assaults and resists him or for the prevention of any atrocious crime attempted to be committed with force, such as murder, robbery, house-breaking in the night-time, rape, mayhem or any other act of felony against the person. Excusable homicide is that which is committed either by misadventure, or in self-defence. Homicide by misadventure is the accidental killing of another where the slayer is doing a lawful act unaccompanied by any criminally careless or reckless conduct. In this case the act was unlawful, unless done to preserve the life of the mother,—for, unless this act to produce a miscarriage was necessary to preserve the life of Mrs. Evans, it was an unlawful act. Dr. McCabe from that witness stand said to you that the miscarriage in this instance was not necessary to preserve her life. If you believe him, then this was an unlawful act, and therefore, it being an unlawful act, Lodge's performing it was no excuse for him in law, and therefore this is not a case of excusable homicide.

Homicide in self-defence is another form of excusable homicide. It is not pretended that Lodge committed this act in self-defence, therefore it is unnecessary for me to say anything further in regard to what is homicide in self-defence, because the facts in this case will not warrant you in finding that it was either justifiable or excusable homicide.

The question then is: Was it felonious homicide? Now felonious homicide at common law is of two kinds; viz: manslaughter and murder, the difference between which consists principally in this,—that in murder there is the ingredient of malice, whilst in manslaughter there is none; for manslaughter, when voluntary, arises from sudden heat of the passions, but murder from the wick-

edness and malignity of the heart: Therefore manslaughter is defined to be the unlawful killing of another without malice either express or implied, and of course without premeditation. Manslaughter is either voluntary or involuntary. Voluntary manslaughter is where a man kills another in the heat of blood, and this usually arises from fighting or from provocation, but it must be shown that such fighting was not preconcerted, for in the case of a deliberate fight, such as a duel, the slayers and his seconds are guilty of murder. You will see at once that this is not voluntary manslaughter, because this act was not committed in the heat of blood at the time by the prisoner, nor was it from provocation. The question then arises, Was it involuntary manslaughter? (I refer to the subject of manslaughter because the counsel for the defendant, Mr. Robinson, referred to that subject in the course of his argument.) Involuntary manslaughter is where one in doing an unlawful act, not felonious nor tending to great bodily harm, or in doing a lawful act without proper caution or requisite skill, undesignedly kills another. Thus, if one shooting at another's poultry, without intent to steal it, accidentally kills a man, it is but manslaughter; but if the shooting be with intent to steal, then such act being felonious, the homicide occasioned thereby is murder. To reduce a charge of murder to manslaughter of this kind, the evidence would be directed to show either that the act committed, or attempted to be done, was not felonious, nor tending to great bodily harm; or that it was not only lawful, but was done with due care and caution, or in cases of science with requisite skill. I have explained to you what involuntary manslaughter is; and that it may be committed in doing an unlawful act which is not felonious. But, of course, if this act by virtue of what we call common law, or by any statute of this State, should be declared felonious, and you should find the prisoner guilty of it and that it caused her death, then, being a felonious act, it would be murder of the second degree, at least.

Having defined what involuntary manslaughter is, we come to

murder.    Murder, which is one of the two kinds of felonious homicide—manslaughter being the other—is when a person of sound memory and discretion unlawfully kills any reasonable creature in being under the peace of the State with malice aforethought either express or implied.    The chief characteristic of this crime, distinguishing it from manslaughter and every other kind of homicide, and therefore indispensibly necessary to be proved, is malice prepense or aforethought.    This term malice is not restricted to spite or malevolence towards the deceased in particular, but, in its legal sense, is understood to mean that general malignity and recklessness of the lives and personal safety of others which proceed from a heart void of a just sense of social duty, and fatally bent on mischief. Malice is implied by law from every deliberate cruel act committed by one person against another, no matter how sudden such act may be ; for the law considers that he who does a cruel act voluntarily does it maliciously.    And whenever the fatal act from which death ensues is committed deliberately, or without adequate provocation, the law presumes it was done in malice ; and it is incumbent upon the prisoner to show from evidence, or by inference from the circumstances of the case, that the offence is of a mitigated character and does not amount to murder.    Under the statute law of this State there are two degrees of murder ; namely :    Murder of the first and murder of the second degree.    The first is where the crime is committed with express malice aforethought or in prepetrating or attempting to perpetrate any crime punishable with death ; and the second degree is where the crime of murder is committed otherwise and with malice aforethought implied by law.    Express malice is proved by evidence of a deliberately formed design to kill another; and such design may be shown from the circumstances attending the act, such as the deliberate selection and use of a deadly weapon, knowing it to be such ; a preconcerted hostile meeting mutually agreed on or notified and threatened by the prisoner ; privily lying in wait ; a previous quarrel or grudge ; antecedent menaces ; the

preparation of poison or other means of doing great bodily harm to the deceased, or the like.

Implied malice (which is alleged under this indictment), or constructive malice, is an inference or conclusion of law from the facts found by the jury; and among these the actual intention of the prisoner becomes an important and material fact; for though he may not have intended to take away life or to do any personal harm, yet he may have been engaged in the perpetration of some other felonious or unlawful act from which the law raises the presumption of malice. It is the difference between express and implied, or constructive, malice aforethought which distinguishes murder of the first from murder of the second degree,—except, however, that under our general statute murder of the first degree may be committed where the malicious killing is done in perpetrating or attempting to perpetrate any crime punishable with death, as rape or arson is in this State, although from such a felonious act malice is merely implied or presumed by law. Therefore murder of the second degree is held to be proved where it is not satisfactorily shown by the evidence submitted to the jury that the killing was done with a deliberately formed design to take life, or in perpetrating or attempting to perpetrate any crime punishable with death, but is so shown that it was done suddenly, without justification or excuse and without any provocation, or without provocation sufficient to reduce the homicide to the grade of manslaughter, or was done in perpetrating or attempting to perpetrate a felony (not capitally punishable) or any unlawful act of violence from which the law raises the presumption of malice.

In the present instance the prisoner is indicted, not for murder of the first degree, but of the second degree only. The charge of murder of the second degree in this indictment is founded upon the allegation that the killing was done by the prisoner while he was engaged in committing or attempting to commit an act—namely to procure a miscarriage—which is declared to be a felony by Chapter 226 of Volume 17 of the Laws of Delaware. Section

2 of said Chapter 226 provides, That every person who, with intent to procure the miscarriage of any pregnant woman supposed by such person to be pregnant, unless the same be necessary to preserve her life, shall among other things use any instrument or other means whatsoever, whether said miscarriage shall be accomplished or not, shall be guilty of a felony, and upon conviction thereof shall be fined and imprisoned as provided in said Section. This indictment charged that, on July 25, 1891, the prisoner Lodge violated said statutory provision and so became guilty of a felony by using an instrument with the intent to procure the miscarriage of Martha I. Evans, as alleged in the indictment, and thereby caused the death of Mrs. Evans with malice aforethought implied by law, and is therefore guilty of murder of the second degree.

It becomes necessary for you to determine first whether the prisoner has violated said statutory provision as charged, and second whether in so doing he caused the death of Mrs. Evans in the manner as alleged in this indictment.

Inasmuch as every accused person is presumed to be innocent until he is proven guilty, the burden is upon the prosecution to prove by competent and satisfactory evidence every essential ingredient of the crime charged in this indictment and that the prisoner is guilty thereof beyond a reasonable doubt. Therefore, before you can find the prisoner guilty in manner and form as he stands indicted, the following essential inquiries must be affirmatively determined beyond a reasonable doubt:

*First.* Did the prisoner Lodge use an instrument in the manner described in the indictment; *Second,* Did he so use it with the intent to procure the miscarriage of Mrs. Evans, he supposing her to be then and there pregnant, and when the same was not necessary to preserve her life; *Third,* Did she die on or about July 30, 1891, and was her death caused by a miscarriage or other injuries to her thereby produced by Lodge; and Fourth, if so, is he guilty of murder of the second degree?

For, if you shall find from the evidence that Lodge did so use the instrument and with the said intent to procure the miscarriage of Mrs. Evans he supposing her to be then pregnant and when the same was not necessary to preserve her life, then he is guilty of the felony defined by the statute we have referred to, whether he did or not thereby produce her miscarriage or cause her death. For the Legislative power of this State having deemed it necessary for the protection of human life and for the preservation of the public safety and welfare, as we must presume, has set the seal of public condemnation and prohibition upon such an act and has declared it to be a felony when committed. And if you shall further find that Mrs. Evans came to her death on or about July 30, 1891, and that her death was caused by a miscarriage or other injuries produced by the prisoner's said felonious act, as alleged in this indictment, then he will, in contemplation of law, be guilty of murder of the second degree, and it will be your imperative duty in accordance with the law which we have stated for your guidance so to find by your verdict. For we have already explained to you that according to the law as it has been declared by the courts of this State, if one person whilst he is engaged in committing another felony (not capitally punishable here), shall kill another person, he is guilty of murder of the second degree, whether he intended to take life or not; for the law presumes malice in such a case and therefore he is guilty of murder of the second degree. And where such killing ensues from the felonious act of performing an operation with intent to procure miscarriage, as provided by our statute, the assent of the pregnant woman whose death was caused thereby to such operation is no defence, in law, to an indictment against the person performing the operation.

That Mrs. Evans actually died on July 30, 1891, is proven by both her physicians, and other witnesses who have appeared before you. That her death was caused by blood-poisoning, resulting from a miscarriage or other injuries caused by an operation performed upon her for that purpose by some one, is also testified

to by the several physicians who were upon the· witness stand. Some of these physicians also testify that they are positive an instrument was used for the purpose of procuring a miscarriage, and that they found two or three wounds within Mrs. Evans' womb which were produced by a blunt instrument; but these witnesses do not undertake to say that the prisoner Lodge is the person who used the instrument, or who produced the miscarriage and the injuries and the resulting blood-poisoning which caused her death. Therefore, although you should believe upon the testimony of said witnesses that Mrs. Evans actually died on July 30, 1891, and that her death was caused by a miscarriage and injuries resulting in said blood-poisoning produced by an operation performed upon her for that purpose by some person, yet you will still have to be satisfied beyond a reasonable doubt, from all the evidence on both sides before you, whether or not the prisoner is the person who performed that operation and caused the miscarriage and injuries and resulting blood-poisoning which occasioned her death.

The prosecution charges that the prisoner Lodge is that person, while the prisoner denies it and contends that the miscarriage and injuries which resulted in her death were caused by Mrs. Evans herself by the use of medicines or a knitting needle or other means for the purpose of procuring her own miscarriage.

The two prominent questions in this case, then, are:

*First*, Is the prisoner the person who caused said miscarriage and injuries by his use of an instrument, as alleged in the indictment? And, *Second*, Did he use said instrument with the intent to procure the miscarriage of Mrs. Evans contrary to the provisions of the statute of 1883, heretofore referred to? In order to prove to your satisfaction that the prisoner at the bar is the person who caused said miscarriage and injuries, and thereby produced her death, the State has offered witnesses to prove facts and circumstances from which you may infer and conclude that he is such person, as well as the dying declarations of Mrs. Evans herself, stating what Fannie

Morris, in part, and Eliza J. Jones, in part, have testified to you as to those declarations. You will recall all these facts and also the statements made as dying declarations, and consider them in connection with all the evidence on both sides in the case, and determine whether they satisfy you beyond a reasonable doubt that the prisoner is the person who actually caused the miscarriage and injuries, which, as the said physicians say, produced blood-poisoning which caused her death. If you shall be so satisfied that the prisoner is that person, then you are to further determine whether said facts and dying declarations, viewed in connection with all the other evidence in the case, satisfy you beyond a reasonable doubt whether the prisoner used the instrument in the operation which caused the miscarriage and injuries and death of Mrs. Evans (if you shall find that it was so caused) with intent to procure her miscarriage and contrary to the provisions of said statute. Now, gentlemen of the jury, as you cannot look into the mind and heart of a man and see his secret intentions and motives, you must look to his actions, expressions and all the other circumstances attending his particular act, in order to ascertain what was his actual intent or purpose at the moment of its commission. In order to show that the prisoner committed the act in question upon Mrs. Evans, the State has sought to show by witnesses who have testified before you, as well as by her own dying declarations, that the prisoner had reason to know that she was then pregnant and that he performed the operation with the intent to procure her miscarriage contrary to the said statute, and therefore feloniously within its meaning and purpose. To prove this intent (as well as other requisites of this charge) the State has sought to show by said witnesses and dying declarations (to which witnesses and dying declarations you will give such credit and weight as, in view of all the evidence before you, you shall deem proper)—The State has sought to show thereby, I say, the following circumstances (if you find we correctly state them to you); that Mrs. Evans had determined to destroy by miscarriage her unborn embryo child ; that she had said to one of

the witnesses, at least, on Thursday, July 23, that she had tried medicines for that purpose and also a knitting needle, but that these had failed; that she sought and had an interview with the prisoner in Lewes on that Thursday; that on the following Saturday, July 25th, she met Lodge near Truitt's old mill; that Lodge asked Mrs. Evans to get out of her carriage, which she did; that after a brief private conversation with her he told her companion, Patience Johnson, to drive down the road a certain distance and return again to Mrs. Evans, which Patience did not do, but remained and saw Lodge take Mrs. Evans behind an unoccupied house and out of her sight; that in about five or ten minutes Mrs. Evans and Lodge re-appeared and Mrs. Evans came to her carriage where she picked up her purse and then took some money out of it and returned to where Lodge was standing; that Mrs. Evans then drove Patience Johnson to her house and upon leaving her there, drove on towards her own home; that on the next night—Sunday—Mrs. Evans had a miscarriage, and on Monday was found with the certain evidence of her recent miscarriage apparent to Patience Johnson, who saw her that morning about seven o'clock, and by her physician, Dr. Frame, who saw her the same day, July 27, about half-past two in the afternoon; that she was on that Monday afternoon suffering from symptoms of blood-poisoning; that, according to Dr. Frame and Dr. Layton, who were her physicians, she continued to grow worse and died on Thursday, July 30—five days after leaving Lodge—from septic fever caused by blood-poisoning resulting from her miscarriage and the injuries attending it.

Now, gentlemen, it is from these circumstances, and such others as you may recall, that the prosecution asks you to infer and conclude that the prisoner both performed said operation with an instrument—as alleged in the indictment—and also did it with intent to procure the miscarriage of Mrs. Evans in violation of the statute, and that thereby he caused the death of Mrs. Evans and is therefore guilty,—not only of the felony, as provided in the statute, —but also of murder of the second degree under the law of this

State. Whether this conclusion is warranted by the evidence is for you, and not this Court, to decide, after you have carefully and conscientiously considered all the evidence on both sides.

If you shall be satisfied beyond a reasonable doubt that it was so warranted, then it will be your duty to find the prisoner guilty in manner and form as he stands indicated—that is, of murder of the second degree.

But in case you should not find him guilty in manner and form as he stands indicted, you may find guilty of manslaughter, if you find that the evidence under the instructions as to the law which we have given you shall warrant you in finding such a verdict; but if you find that he is guilty of neither murder of the second degree nor manslaughter, you cannot find him, under this indictment, guilty of any other offence, but you must find him not guilty, and render a verdict accordingly of not guilty. But, as we have already informed you, if you find that the said statute against procuring miscarriages was clearly violated by the prisoner, and that in violating it, as alleged in the indictment, he caused Mrs. Evans' death, then he cannot be found guilty of manslaughter in this instance, but must be found guilty of murder of the second degree by your verdict.

This, gentlemen of the jury, so far as we comprehend the case, comprises all that is necessary for us to say to you. We therefore leave this case in your hands to render such verdict as, according to your oaths, you shall find warranted by the evidence.

Verdict: " Guilty."