Thornton A. JENKINS, Defendant Below,
Appellant,

v.

The STATE of Delaware, Plaintiff Below,
Appellee.

Clifford WARNER, Defendant Below,
Appellant,

v.

The STATE of Delaware, Plaintiff Below,
Appellee.

Supreme Court of Delaware.

March 27, 1967.

264

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, for Thornton A. Jenkins, defendant below, appellant.

Richard J. Baker, Wilmington, for Clifford Warner, defendant below, appellant.

F. L. Peter Stone and Jay H. Conner, Deputy Attys. Gen., for the plaintiff below, appellee.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice:

Thornton A. Jenkins was convicted of murder in the first degree and burglary in the fourth degree. Clifford Warner was convicted of murder in the second degree and burglary in the fourth degree. They were tried together and they appeal jointly.

Jenkins and Warner were arrested on the morning of March 17, 1965. Earlier, the police discovered the victim of an apparent homicide in a junkyard in Wilmington; death had occurred during the previous night. The arrests were made because police had found Jenkins and Warner loitering near the junkyard the prior evening.

Although the jury recommended mercy, the Trial Judge disregarded the recommendation and Jenkins was sentenced to death upon the first degree murder conviction;[1] a sentence of five years imprisonment was imposed on the burglary conviction. Warner was sentenced to life imprisonment upon the second degree murder conviction and to five years imprisonment on the burglary conviction.

Other pertinent facts will be stated in the discussion of the grounds of appeal to which they relate.

## I.

The dispositive issue as to Jenkins' appeal from the conviction of first degree murder is whether the evidence was sufficient to support the conviction. We think not.

The State proved that the victim was killed by the blow of a blunt instrument on the head; there was no evidence of the weapon used. Other injuries included abrasions and contusions of the face with lacerations of the mouth and chin; on the neck there was a cut five inches long; the nose and cheek bones were fractured as were several ribs; the liver was ruptured. The State argues from this that the evidence shows that the assailant cut the victim's throat and kicked or stomped him.

Except for testifying on *voir dire* regarding the taking of his written statement, Jenkins did not take the stand at trial. In his statement, Jenkins admitted that he was in the junkyard with a companion at about 8:00 o'clock on the night before his arrest, stealing wire and fire extinguishers. He related that, while in the yard near the office, he heard the telephone ring and observed a shadow through an office window; that he and his companion ran across the yard and hid near a crane; that as they attempted to leave the yard, he was struck on the arm by someone whom he thought was the night watchman; that he and his companion "grabbed" the man, he from one side and his companion from the other; that there was a struggle and the man fell to the ground. According to the statement, Jenkins did not have a weapon nor did he see a weapon; he did not recall the watchman saying anything because he had been drinking all day.

Jenkins' statement plus the testimony as to the nature of the victim's wounds constituted the only evidence in the case that could be related to express malice aforethought, an essential element of first degree murder in this State.[2] We find such evidence insufficient to prove express malice aforethought.

---

1. The defendant challenges the power of the Trial Judge to disregard the recommendation of mercy. In view of the conclusion reached herein, this issue has become academic.

2. 11 Del.C. § 571 provides:
 "§ 571. Murder in the first degree
 "Whoever commits the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping or treason, is guilty of murder in the first degree and of a felony, and shall suffer death."

■ The elements of express malice aforethought were stated by this Court in Bantum v. State, 7 Terry 487, 85 A.2d 741 (1952) as follows:

> "* * * in addition to malice (which is common to both degrees of murder) there must exist the elements of formed design or intention to kill or to do great bodily harm and the sedate and deliberate mind of which the intention to kill or do great bodily harm is the product. Each of these elements must be proved by external circumstances, that is by circumstances other than the mere fact of the killing which fact, at common law, itself gave rise to an inference of malice (IV Blackstone, 201). Each element, together with malice, must be present and proved beyond a reasonable doubt."

In State v. Gardner, Del., 203 A.2d 77 (1964), the elements of express malice were restated by this Court as follows:

> "* * * express malice consists of 3 elements: (1) malice; (2) a formed design or intention to kill or to do great bodily harm; and (3) a sedate and deliberate mind of which that intention is the product."

The defendant concedes that an unexplained killing may give rise to the presumption of malice. But it is asserted that the circumstantial evidence in this case was insufficient to prove the other two requisite elements of express malice aforethought. We agree because of that which was not proved as well as that which was proved.

First, there was no evidence fulfilling any of the accepted grounds upon which courts permit the inference of a "formed design or intention to kill or to do great bodily harm" and "a sedate and deliberate mind of which that intention is the product." There was no evidence that Jenkins knew, or had any prior connection with, the victim. There was no evidence of deliberate selection and use of a deadly weapon; or of a lying in wait; or of antecedent threats. There was no proof of hatred, ill will, spite, or jealousy; or of a plan or scheme to kill or to do great bodily harm. See Bantum v. State, supra; State v. Winsett, Del., 205 A.2d 510, aff'd Del., 222 A.2d 781 (1966).

■ Secondly, the elements of express malice were not proved by the evidence adduced in the case. To establish a fact in issue, circumstancial evidence must be inconsistent with any other rational conclusion. Holland v. State, 9 Terry 559, 107 A.2d 920 (1954); Patrick v. State, Del., 227 A.2d 486 (1967). We are unable to say that the circumstantial evidence before us is inconsistent with any rational conclusion other than that Jenkins had a "formed design or intention to kill or to do great bodily harm" to the victim and a "sedate and deliberate mind of which that intention is the product."

Taken at its best from the State's point of view, the evidence and inferences possible therefrom prove that the victim, a stranger to Jenkins, was badly beaten and died of his wounds. The evidence adduced is equally consistent with a killing perpetrated without design or premeditation, though with a "depraved heart," or a "cruel and wicked indifference to human life." See State v. Winsett, supra. This is tantamount, of course, to saying that the evidence is as reasonably consistent with implied malice and second degree murder[3] as with express malice and first degree murder. It follows that the circumstantial evidence in this case is insufficient to support a conviction of first degree murder.

---

3. 11 Del.C. § 572 provides:
"§ 572. Murder in the second degree
"Whoever commits the crime of murder, other than murder in the first degree, is guilty of murder in the second degree and of a felony, and shall be imprisoned for life, and may be fined in such amount as the court, in its discretion, may determine."

Accordingly, it is the opinion of the Court that Jenkins' conviction of murder in the first degree must be reversed and the case remanded for new trial.

## II.

The dispositive issue of Warner's appeal from the conviction of second degree murder is whether the jury was properly instructed regarding the "felony-murder" rule.

The charge to the jury in this respect was as follows:

"* * * when one or more persons is engaged in the commission of a felony and there is an unintentional killing, the law will imply malice from the fact that a felony was committed and murder in the second degree will result."

In response to the jury's inquiry made several hours after it retired to deliberate, the Trial Judge charged:

"Now talking again in the abstract, if two men set out to burglarize a place, let's say a building just for the purpose of this example, and that's all they set out to do, commit a burglary, and one stays outside as a lookout and one goes inside, and the one inside unintentionally kills somebody, then both persons are guilty of second degree murder. The fact that a felony was being committed implies the malice so we have implied malice and hence second degree murder. * * *"

It is our opinion that these jury instructions constituted reversible error.

■ Under the common law felony-murder rule, any homicide committed in the perpetration of any felony constituted mur-

der. The question before us is whether common law rule prevails in this State, unlimited and unqualified.

The felony-first degree murder rule is expressly limited by Statute to three felonies: rape, kidnapping and treason. 11 Del.C. § 571, supra. The defendant contends that the enumeration of three types of felonies in § 571 manifests a legislative intent to abolish the felony-murder rule as to all other felonies. We disagree.

A felony-second degree murder rule has long been recognized in Delaware, E. g., State v. Brown, 1 Houst.Cr.Cas. 539, 551 (1878) (obstructing railroad tracks); State v. Lodge, 9 Houst. 542, 33 A. 312 (1892) (abortion); State v. Blackburn, 7 Pennewill, 479, 75 A. 536 (1892) (robbery); State v. Fleetwood, 6 Pennewill, 153, 65 A. 772 (1906) (abortion); State v. Harris, 3 W.W.Harr. 236, 134 A. 693 (1923) (robbery). In 1958, when capital punishment was abolished in this State, the felony-murder aspect of the first degree murder statute was amended by specifying "the crime of rape, kidnapping or treason" in place of "any crime punishable with death", the language of the earlier § 571.[4] 51 Del. Laws, Chap. 347. It is clear on the face of that Statute that this change developed from the abolition of capital punishment,[5] and not from a legislative intent to abolish the felony-murder rule generally.

■ We conclude that by § 571 the General Assembly intended to prescribe the scope of the felony-first degree murder rule; that the long-standing felony-second degree murder rule was not abrogated by the Statute.

Upon this appeal, therefore, we are called upon to examine into the scope of the felony-second degree murder rule. Is it

---

4. Prior to 1958, 11 Del.C. § 571 provided:

"§ 571. Murder in the first degree

"Whoever commits the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate any crime punishable with death, is guilty

of murder in the first degree and of a felony, and shall suffer death.

5. The death penalty was returned to § 571 when capital punishment was reinstated in Delaware in 1961. 53 Del.Laws, Chap. 310.

limited to common law felonies, as the defendant here contends in pointing out that burglary in the fourth degree is a statutory felony? And do all types of felonies come within the rule; or only those inherently and foreseeably dangerous to human life; or only those having a proximate causal connection with the death?

The common law felony-murder rule arose in England when practically all felonies were punishable by death. If the intended crime was a felony, its felonious design was imputed to the act actually committed; and if the act committed was a homicide, it became murder since it was immaterial whether the offender was hanged for one felony or another. 3 Coke Inst. 56 (1797); Powers v. Commonwealth, 110 Ky. 386, 61 S.W. 735, 63 S.W. 976 (1901).

With the general trend toward mitigation in the severity of punishment for many felonies, and with the addition of many statutory felonies of a character less dangerous than was typical of most common law felonies, the irrationality and unfairness of an unlimited felony-murder rule became increasingly apparent.

As early as 1862, the requirement of a proximate causal connection between the felony and the homicide was recognized by the English courts. Reg. v. Horsey, 3 F. & F. 287. This limitation was adopted in several American jurisdictions. E. g., Burton v. State, 122 Tex.Cr.R. 363, 55 S.W.2d 813 (1933); State v. Weisengoff, 85 W. Va. 271, 101 S.E. 450 (1919); State v. Glover, 330 Mo. 709, 50 S.W.2d 1049, 87 A.L.R. 400 (1932).

Again taking the lead, the English courts further limited the felony-murder rule to felonies inherently and foreseeably dangerous to life. In the leading case of Reg. v. Serne, et al., 16 Cox.Cr.Cas. 311 (1887), the jury was charged:

"* * * [I]nstead of saying that any act done with intent to commit a felony and which causes death amounts to murder, it would be reasonable to say that any act known to be dangerous to life, and likely in itself to cause death done for the purpose of committing a felony which caused death, should be murder."

See also Reg. v. Whitmarsh, 62 Just.P. 711 (1898). The *Serne* limitation also found favor in a number of American jurisdictions. E. g., People v. Pavlic, 227 Mich. 562, 199 N.W. 373, 35 A.L.R. 741 (1924); People v. Goldvarg, 346 Ill. 398, 178 N.E. 892 (1931); Williams v. Commonwealth, 258 Ky. 830, 81 S.W.2d 891 (1935).

In California, both the foregoing limitations were adopted. The California rule has been stated as follows: a homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (except felonies enumerated in the first degree murder statute) constitutes at least second degree murder.[6] E. g., People v. Ford, 60 Cal.2d 772, 36 Cal.Rptr. 620, 388 P.2d 892 (1964); People v. Williams, 63 Cal.2d 452, 47 Cal.Rptr. 7, 406 P.2d 647 (1965); People v. Washington, 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130 (1965).

■ In our judgment, the California rule is supported by logic, reason, history, and common sense.[7] The only rational function

6. Such limitations upon the felony-murder rule are favored by students of the subject. See 3 Stephen, History of the Criminal Law of England, pp. 57, 74–76 (1883); Morris, The Felon's Responsibility for the Lethal Acts of Others, 105 U.Pa.L.Rev. 50; Perkins, A Re-Examination of Malice Aforethought, 43 Yale L.J. 537, 563 (1934); Moreland, The Law of Homicide, p. 224 (1952); compare Michael & Wechsler, A Ra-

tionale of the Law of Homicide, 37 Col.L. Rev. 701, 713–715 (1937).

7. There are statutory felonies, such as forgery and counterfeiting (11 Del.C. §§ 541–544), embezzlement (11 Del.C. § 636), pandering (11 Del.C. § 733), and pimping (11 Del.C. § 736), as to which an unqualified felony-murder rule would be incongruous. The same may be said as to comparatively minor common law felonies, such as pick pocketing and petty

of the felony-murder rule is to furnish an added deterrent to the perpetration of felonies which, by their nature or by the attendant circumstances, create a foreseeable risk of death. This function is not served by application of the rule to felonies not foreseeably dangerous. The rule should not be extended beyond its rational function. Moreover, application of the rule to felonies not foreseeably dangerous would be unsound analytically because there is no logical basis for imputing malice from the intent to commit a felony not dangerous to human life.

█ It is the opinion of the Court, therefore, that the felony-second degree murder rule of this State should be limited to homicides proximately caused by the perpetration or attempted perpetration of felonies which are, by nature or circumstances, foreseeably dangerous to human life, whether such felonies be common law or statutory. We find no valid reason for distinguishing in this connection between felonies having common law origins and those purely statutory.

█ Whether the commission of a particular felony in a given instance was foreseeably dangerous is for the court and jury to decide. In that determination, both the nature of the felony and the circumstances of its commission are relevant factors. Burglary in the fourth degree [8] may, or may not, be foreseeably dangerous to human life, depending upon whether someone may be reasonably expected to be present in the building, and upon other circumstances of the case.

We hold that the Trial Court erred when it charged the jury that second degree murder may arise from the perpetration of any felony, without regard for the nature of the felony, the circumstances of its commission, or the causal connection between the

felony and the homicide. The second degree murder conviction of Warner must, therefore, be reversed and the cause remanded for new trial.

## III.

The foregoing are the only questions that need be decided for disposition of the appeals from the murder convictions. While it is unnecessary to decide the other questions raised on the appeals, we discuss them nevertheless for the guidance of the Trial Court on the new trial.

### The Search and Seizure

Jenkins and Warner were taken into custody, together with Leona Marshall and others, at 617 East Fifth Street, Wilmington, at about 10:00 A.M. No search was made of the house at that time. The house was rented by Miss Marshall; she was the sole tenant insofar as the landlord was concerned. Jenkins was her boyfriend, lived in the house with her, and gave her money for the rent. Upon arrival at the police station, Jenkins and Warner were taken to separate rooms. The police asked Miss Marshall for her consent to search the house; she gave her consent and returned with them. Jenkins was not asked for his consent to the search of the premises. Accompanied by Miss Marshall, the police searched the premises; several articles in open view were seized in the basement and in a bedroom shared by Jenkins and Miss Marshall. There was no search warrant and the search was not made incident to an arrest.

At trial, the defendant objected to admission in evidence of the articles seized, on the grounds that the search and seizure was neither pursuant to a search warrant, nor incident to arrest; that the right against an unlawful search is a personal right which only the defendant could waive; that the

thefts. In this connection, we note 11 Del.C. § 101(b) providing: "Any crime or offense not specifically designated by law to be a felony is a misdemeanor."

8. Burglary in the fourth degree involves the breaking and entering of a building other than a dwelling house, the subject of the other three degrees of burglary. 11 Del.C. §§ 391–395.

search without Jenkins' consent constituted an unreasonable invasion of his privacy in violation of his constitutional rights under the Fourth and Fourteenth Amendments. Rickards v. State, 6 Terry 573, 45 Del. 573, 77 A.2d 199 (1950). The Trial Judge overruled the objections, holding that the consent of Miss Marshall, who was also an occupant of the premises and the legal tenant, was sufficient to uphold the search.

On the appeal, the defendant contends that (1) Miss Marshall's consent was not voluntary, and (2) even if voluntary, it was not an effective waiver of the defendant's rights.

▆ We find the defendant's first contention without merit. Upon review of the record, we are satisfied that there is sufficient evidence to support the Trial Court's conclusion that Miss Marshall's consent was voluntarily given. The admission of the evidence seized is not vulnerable on this ground.

The defendant's second contention raises this question: May the consent of a third person to a search and seizure bind a nonconsenting party?

Where the consenting person possesses "sufficient control" over the premises searched, a large body of state and federal decisions uphold the constitutionality of the search and seizure, and permit the use of the seized evidence against a nonconsenting

party. See Annotation, 31 A.L.R. (2d) 1078; Third Party Consent to Search & Seizure, 33 U.Chi.L.Rev. 797, 801 (1966).

"Sufficient control" is sometimes predicated upon the agency concept of implied consent or apparent authority. E. g., Bielicki v. Superior Ct. of Los Angeles Co., 57 Cal.2d 602, 21 Cal.Rptr. 552, 371 P.2d 288, 291 (1962); United States v. Eldridge (4 Cir., 1962) 302 F.2d 463. The theory is that the third person was apparently authorized by the nonconsenter to waive his rights. This approach has been criticized recently by the United States Supreme Court in Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 892, 11 L.Ed.2d 856 (1964), where the Court stated: "Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority'." See also Roberts v. United States (8 Cir., 1964) 332 F.2d 892.

"Sufficient control" is more frequently predicated upon a joint and equal possession and control of the premises searched.[9] The line of reasoning which underlies the joint control doctrine may be stated as follows: the consenting person has the authority, acting in his own behalf and not as agent for the nonconsenter, to permit a search of premises to which he has immediate right of possession and control; a search pursuant to such consent is reasonable, absent other cir-

9. The cases often involve spousal relationships, but are not limited thereto. For cases upholding a wife's consent as against her husband, see E.g., State v. Cairo, 74 R.I. 377, 60 A.2d 841 (1948); People v. Harvey, 48 Ill.App.2d 261, 199 N.E.2d 236 (1964); Bellam v. State, 233 Md. 368, 196 A.2d 891 (1964); People v. Carter, 48 Cal.2d 737, 312 P.2d 665 (1957); United States v. Heine (2 Cir., 1945) 149 F.2d 485; United States v. Sergio (E.D.N.Y., 1937) 21 F.Supp. 553. It has been recognized that it is not the marital status, but rather the joint control and possession of the couple's premises that establishes the wife's authority to give an effective consent. See Rob-

erts v. United States (8 Cir., 1964) 332 F.2d 892; State v. Hall, 264 N.C. 559, 142 S.E.2d 177 (1965); People v. Perroni, 14 Ill.2d 581, 153 N.E.2d 578 (1958). For cases not involving spousal relationships, but nonetheless upholding third person consent on the basis of joint control, see E.g., United States v. Sferas (7 Cir., 1954) 210 F.2d 69 (partner of defendant); Nestor v. State, 243 Md. 438, 221 A.2d 364 (1966) (co-tenant with defendant); People v. Howard, 166 Cal. App.2d 638, 334 P.2d 105, 106 (1958) (mistress of defendant); People v. Silva, 140 Cal.App.2d 791, 295 P.2d 942 (1956) (brother of defendant's mistress who lived on the premises).

cumstances tending to make it unreasonable; evidence that is the product of a reasonable search may be used against anyone. Thus, where two or more persons have joint and equal possession and control of the premises, the prevailing rule is that any one of them may consent to a search; and the evidence thus disclosed may be used against any of them.

Accepting the possession and control rule, as we do, where the consenting person has more than joint and equal possession and control of the premises, *a fortiori*, he has sufficient control to bind other occupants by his consent to a search. Thus, in Burge v. United States (9 Cir., 1965) 342 F.2d 408, the consent of the lessee of an apartment was held to bind the guest-occupant. And, in State v. Malcom, Del., 203 A.2d 270 (1964), the Superior Court held that the parent could effectively bind her minor son by her consent to a search of the home. See also State v. Kinderman, 271 Minn. 405, 408, 136 N.W.2d 577 (1965); Maxwell v. Stephens (8 Cir., 1965) 348 F.2d 325.

■ Returning to the case at hand: although Miss Marshall and Jenkins were joint occupants, it is clear that Miss Marshall, as sole legal tenant, had a superior right of possession and control. By virtue of that superior right, it is our conclusion that she was able to give effective consent to a search of the premises. Because of her consent, the search was reasonable and the product of that search was admissible in evidence against Jenkins.

The defendant places principal reliance upon Stoner v. State of California, supra, wherein the United States Supreme Court emphasized the personal character of the right against unreasonable search and seizure. There, the Court held that a hotel desk clerk could not properly authorize the police to search the defendant-hotel guest's room. *Stoner* is distinguishable on its facts in that the consenting party's right of control and possession was inferior to that of the nonconsenting party. The defendant also cites State v. Pina, 94 Ariz. 243, 383 P.2d 167 (1963); Burge v. United States (9 Cir., 1964) 333 F.2d 210; Tompkins v. Superior Court, etc., 59 Cal.2d 65, 27 Cal. Rptr. 889, 378 P.2d 113 (1963); United States v. Rykowski, (S.D.Ohio, 1920) 267 F. 866; Cofer v. United States (5 Cir., 1930) 37 F.2d 677. The *Burge* case was reversed upon reargument, see. 342 F.2d 408; the other cited cases are factually inapposite.

*The Right to Counsel*

The defendants contend that because they were not advised of the right to have counsel appointed to advise them at the police station, the incriminating statements taken from them were admitted in evidence unlawfully. The defendants rely upon Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ The trial of the cases before us commenced on January 10, 1966. It is settled now that *Miranda* will be applied in Delaware only in those cases the trial of which commenced after June 13, 1966. Parson v. State, Del., 222 A.2d 326 (1966); Priest v. State, Del., 227 A.2d 576 (1967). Accordingly, *Miranda* is not applicable in the instant cases.

The defendants further argue that their convictions should be reversed because the Trial Court failed to apply the standards set forth in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), in determining (1) whether their statements were given voluntarily, and (2) whether they had been denied the right to counsel.

■ The first contention is based upon the unfounded supposition that *Escobedo* in some way altered the traditional test of voluntariness. The record shows that, after *voir dire* examination, the Trial Judge found that the statements were voluntary. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Upon review of the record, we conclude that there was sufficient evidence to support that finding.

We find nothing inadequate or improper in the inquiry on voluntariness, by reason of either *Escobedo* or *Jackson*.

■ As for the defendants' second contention, it is conceded that neither of the defendants requested counsel at the police station. As we have frequently held, *Escobedo* will be limited in application to its own factual situation. King v. State, Del., 212 A.2d 722 (1965); Parson v. State, Del., 222 A.2d 326 (1966). In *Escobedo*, there was a request to consult retained counsel at the police station; since no such request was made here, *Escobedo* is inapplicable in the instant cases.

*The Joint Trial*

Jenkins contends that he was deprived of a fair and impartial trial because he was tried jointly with Warner.

Both defendants were indicted for first degree murder. At an early pre-trial stage, Jenkins moved for severance under Superior Court Criminal Rule 14, Del.C.Ann.,[10] asserting *inter alia* that Warner's written statement incriminated himself and implicated Jenkins; that the admission of Warner's statement at a joint trial would render the trial unfair as to Jenkins. The motion was denied.

The substance of Jenkins' statement is stated above. According to Warner's statement, he and a companion (whose name was stricken[11] from the statement at the trial) went to the junkyard on the night of the killing to steal wire and fire extinguishers; the companion went through the fence into the junkyard alone; Warner remained outside the fence; the companion passed the stolen goods through the fence to Warner who loaded them into an automobile; they left together.

The written statements of both defendants were admitted in evidence; neither took the stand at the trial except upon the issue of the voluntariness of the statements. The specific prejudice claimed by Jenkins is that Warner's statement, admitted over Jenkins' objection, blamed the killing upon Jenkins because it located Jenkins alone inside the junkyard and Warner outside. Jenkins asserts that it was clear from an inquiry by the jury,[12] and from the verdicts, that the jury was influenced by the Warner statement as to the degree of culpability and credibility of each defendant.

We agree that Jenkins' trial on the murder charge may have been rendered unfair by the admission of the Warner statement in the joint trial. In view of the nature and circumstances of this case, it is our opinion that the severance should have been granted.

■ A motion for severance is addressed to the sound discretion of the trial court. Ordinarily, defendants indicted jointly should be tried together; but, if justice requires it, the trial court should grant separate trials. Garner v. State, 1 Storey 301, 145 A.2d 68 (1958). What constitutes abuse of discretion depends upon

10. Superior Court Criminal Rule 14 provides:
"RULE 14. RELIEF FROM PREJUDICIAL JOINDER
"If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires."

11. The attempt to delete notwithstanding, Jenkins' name was legible we think, to a juror with knowledge gained from Jenkins' statement and other evidence. As a practical matter, even a complete obliteration would have failed to effectively conceal Jenkins' implication, in view of other evidence in the case. Compare People v. Serritello, 385 Ill. 554, 53 N.E. 2d 581 (1944).

12. During its deliberations, the jury sent to the Court the following inquiry:
"If a man is acting as lookout at a burglary and a murder is committed during the burglary, is the lookout equally guilty of murder even though the murder took place out of his sight?"

the facts and circumstances of each case. Burton v. State, 1 Storey 546, 149 A.2d 337 (1959); Weekley et al. v. State, Del., 222 A.2d 781 (1966). As a general rule, however, it may be said that discretion has been abused by denial of severance when there is reasonable probability that, because of a co-defendant's extra-judicial statement, substantial injustice and denial of fair trial may result from a joint trial.

■ Ordinarily, an abuse of discretion will not arise from the mere fact that the confession or admission of a co-defendant, implicating the moving defendant and not admissible against him, will be introduced at the joint trial. Some other factor must be present, such as: (1) absence of other substantial, competent evidence of the movant's guilt, e. g., Burton v. State, supra; (2) antagonistic defenses as between the co-defendant and the movant, e. g., People v. Barbaro, 395 Ill. 264, 69 N.E.2d 692 (1946); and (3) difficulty of segregating the evidence as between the co-defendant and the movant, e. g., Day v. State, 196 Md. 384, 76 A.2d 729 (1950). See generally Annotation, 54 A.L.R.2d 830, 855–862.

■ It is our opinion that these factors were present in the instant case. First, there was no other substantial, competent evidence of Jenkins' guilt as to the first degree murder charge; the State's evidence was limited to the two statements in this regard. Second, the defenses of Jenkins and Warner were antagonistic; to believe Warner was to disbelieve Jenkins and this made the difference, we think, between first and second degree murder in the two verdicts. Third, we are convinced that it was difficult, if not a practical impossibility, for the jurors to disassociate the evidence offered against one accused from the evidence offered against the other. However intelligent and conscientious, a juror must have had difficulty, to say the least, in removing from his mind the impression necessarily made by the statement of each of these defendants against the other. The respective verdicts make this manifest. Compare Day

v. State, supra. Insofar as the degree of culpability and credibility was concerned, to try both Jenkins and Warner together was, in effect, to try each upon the extra-judicial statement of the other. Compare State v. Desroche, 47 La.Ann. 651, 17 So. 209. This is impermissible under our fundamental concepts of criminal justice, including the right of an accused to be confronted by, and to cross examine, his accuser. See People v. Aranda, 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265 (1965).

■ We are aware that the Trial Court repeatedly cautioned the jury that the statement of one co-defendant should not be used against the other. Under the circumstances before us, such cautionary instructions—like attempts to delete a name from a co-defendant's statement—do not correct substantial injustice or make an otherwise unfair trial fair. It is our opinion that admonitions to the jury, under these circumstances, neither eradicate inadmissible evidence from the minds of the jury nor obviate the possibility of the jury being misled by the statement of a co-defendant. Compare Stallard v. State, 187 Tenn. 418, 215 S.W.2d 807 (1948); People v. Sweetin, 325 Ill. 245, 156 N.E. 354 (1927).

For these reasons, it is the opinion of the Court that there was abuse of discretion in the denial of the motion for severance. Upon the remand, if the motion for severance is renewed, the grant or denial thereof will rest in the sound discretion of the Trial Court, to be exercised in the light of the foregoing standards and guidelines.

In State v. Brinte, 4 Pennewill 551, 58 A. 258 (1904), the Court of Oyer and Terminer expressed views inconsistent with the foregoing. To the extent that is so, the *Brinte* case no longer represents the prevailing rule in this State.

*The Chain of Evidence*

The defendants contend that proof of the handling of articles of clothing, sent to the F.B.I. for examination, was inadequate; that, therefore, the articles were improperly

admitted in evidence. We find no merit in this position.

*Self Defense Instruction*

 The Trial Court properly declined to give an instruction on self defense. We find no evidence to justify such charge.

IV.

Undoubtedly, the question of the application of *Miranda* will arise upon retrial. For the guidance of the Trial Court, we state these views:

 It is our opinion that *Miranda* should not apply at retrial, notwithstanding the fact that it will be held after the June 13, 1966 effective date of *Miranda*. We think it neither logical nor reasonable that the retrial should be conducted under rules different from those prevailing when the cases were tried the first time. In Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the United States Supreme Court stated: "We hold further that Miranda applies only to cases in which the trial began after the date of our decision [June 13, 1966] * * *." Although *de novo*, a new trial is not a new case; it is a continuation of the original case until the judgment is final. In our opinion, *Johnson* refers to "cases" the original trial of which commenced after June 13, 1966. Neither *Miranda* nor *Johnson*, in our view, requires the courts of this State to make applicable upon retrial the *Miranda* rules which were not applicable at the original trial. The following statements in *Johnson* support our view:

"Future defendants will benefit fully from our new standards governing in-custody interrogation, while past defendants may still avail themselves of the vol-

untariness test. Law enforcement officers and trial courts will have fair notice that statements taken in violation of these standards may not be used against an accused.

" * * * [W]e do not find any persuasive reason to extend *Escobedo* and *Miranda* to cases tried before those decisions were announced, even though the cases may still be on direct appeal."

We realize that our view is the minority view in the few cases in which the question has been decided. See State v. Brock, 101 Ariz. 168, 416 P.2d 601 (1966); State v. Shoffner, 31 Wis.2d 412, 143 N.W.2d 458 (1966); Gibson v. United States (5 Cir., 1966) 363 F.2d 146. Nonetheless, we favor the minority view. See also State v. Vigliano, 47 N.J. 504, 221 A.2d 733 (1966); State v. Bradshaw, R.I., 221 A.2d 815 (1966).

V.

As to the burglary convictions: except for certain issues decided in Part III hereof, the appeals are based upon attacks on the indictment.

The defendants contend that because the State failed to notify them of the presentment of the charges to the grand jury, they were denied due process of law. This argument is built upon Superior Court Criminal Rule 6(b) (1),[13] it being contended that the right to challenge the grand jury prior to indictment is meaningful only if the defendant is notified in advance of the presentment of the charges to the grand jury.

 The contention is without merit. The defendants were held for the Superior Court by the committing magistrate. Counsel for the defendants knew, or should have

---

13. Superior Court Criminal Rule 6(b) (1) provides:

"(1) Challenges. The Attorney General or a defendant who has been held to answer in the Superior Court may challenge the array of jurors on the ground that the grand jury was not selected, drawn or summoned in accordance with law, and may challenge an individual juror on the ground that the juror is not legally qualified. Challenges shall be made before the administration of the oath to the jurors and shall be tried by the court."

known, that the charges would be presented to the grand jury in due course soon thereafter. Counsel could have easily obtained information as to the identity of the members of the grand jury and the date of its session, if such information were desired. The State owed no duty to notify the defendants of the pendency of the grand jury proceeding; neither the Rule nor due process required it.

We have examined the cases cited by the defendants dealing with due notice of judicial and quasi-judicial proceedings as an element of due process. None dealt with grand jury proceedings; none is apposite.

Furthermore, in this connection, there was an opportunity for the defendants to challenge the grand jury or a member thereof after indictment. Superior Court Criminal Rule 6(b) (2) [14] furnishes opportunity after indictment to challenge on the same grounds available under Rule 6(b) (1) before indictment. Accordingly, the defendants can complain of no final loss of opportunity to challenge by reason of lack of information prior to indictment.

■ The second prong of attack on the indictment is the contention that a junkyard may not be the subject of burglary under our Statute. 11 Del.C. § 395 describes the crime of burglary in the fourth degree as the breaking and entering of a "building". The statutory definition of a "building" includes an "inclosure". 11 Del.C. § 391(b).

The junkyard here involved was surrounded by a fence. We hold that it was an "inclosure" within the meaning of the Statute; that, therefore, the indictment is not defective as alleged.

■ Finally, the defendants contend that the indictment alleged that the junkyard was owned by Morris Gordon whereas the evidence showed that Delaware Compressed Steel Company was the owner. The indictment was amended to conform to the evidence by order of the Trial Court. We find no abuse of discretion in allowing the amendment that cured the variance.

It is the opinion of the Court that there was no error in the burglary convictions. They are, therefore, affirmed.

## UPON MOTION FOR REARGUMENT

We have denied motions for reargument filed by all parties herein, with this exception: the question of whether the guidelines of Miranda v. State of Arizona, supra, shall apply upon the retrial of these cases.

The parties have been able to add little to that which was before us when we reached the view of the matter hereinabove stated. We have examined the additional cases cited by the defendants: People v. LaBelle, Co.Ct., 277 N.Y.S.2d 847 (1967); People v. Kilduff, 52 Misc.2d 743, 276 N.Y.S.2d 814 (1966); United States ex rel. Pierce v. Pinto (D.C.N.J., 1966) 259 F.Supp. 729, aff'd 374 F.2d 472 (3 Cir. 1967); Holloway v. State, 32 Wis.2d 559, 146 N.W.2d 441 (1966); State v. Ruiz, Haw., 421 P.2d 305 (1966); Creech v. Commonwealth, Ky., 412 S.W.2d 245 (1967). We adopt the analytical approach reflected in People v. LaBelle, supra, and in the dissenting opinions in State v. Brock and State v. Shoffner, supra.

In the final analysis, the answer to the problem lies within the four corners of Johnson v. State of New Jersey, supra. Looking to that language, the key portion relevant to this issue, it seems to us, is the following:

"* * * Future defendants will benefit fully from our new standards governing in-custody interrogation, while past

---

14. Superior Court Criminal Rule 6(b) (2) provides:

"(2) Motion to Dismiss. A motion to dismiss the indictment may be based on objections to the array or on the lack of legal qualification of an individual juror if not previously determined upon challenge. * * *"

**276**

defendants may still avail themselves of the voluntariness test. Law enforcement officers and trial courts will have fair notice that statements taken in violation of these standards may not be used against an accused. Prospective application only to trials begun after the standards were announced is particularly appropriate here. Authorities attempting to protect the privilege have not been apprised heretofore of the specific safeguards which are now obligatory. Consequently they have adopted devices which, although below the constitutional minimum, were not intentional evasions of the requirements of the privilege. In these circumstances, tô upset all of the convictions still pending on direct appeal which were obtained in trials preceding *Escobedo* and *Miranda* would impose an unjustifiable burden on the administration of justice.

"At the same time, we do not find any persuasive reason to extend *Escobedo* and *Miranda* to cases tried before those decisions were announced, even though the cases may still be on direct appeal. * * *.

"In the light of these additional considerations, we conclude that *Escobedo* and *Miranda* shall apply only to cases commenced after those decisions were announced. * * *"

In view of the foregoing statements, we remain of the opinion that *Johnson* does not require the Courts of this State to make applicable upon retrial *Miranda* guidelines which were not applicable upon the original trial. In the light thereof, we retain the view that *Johnson* does not require us to change the governing rules so drastically, midway between the first trial and the retrial of the same case.

We adhere to the ruling that, upon retrial of the instant cases, the guidelines of *Miranda* shall not apply.