STATE OF DELAWARE v. LOUIS H. GARDNER.

(*August* 4, 1964.)

TERRY, C. J., and WOLCOTT and CAREY, J. J., sitting.

*Thomas Herlihy, III*, Chief Deputy Atty. Gen., and Peter Warren Green, Deputy Atty. Gen., for the State of Delaware.

*Frank J. Miller*, of Foulk, Walker, Miller & Wakefield, and *Harvey B. Rubenstein*, of Leshem & Rubenstein, for Louis H. Gardner.

Supreme Court of the State of Delaware, No. 89, 1963.

CAREY, Justice.

The following question was certified to us from the Superior Court for New Castle County:

"May a defendant be indicted and convicted of murder in the first degree under 11 *Del. C.* § 571 where express malice aforethought is directed toward the intended victim but not in fact toward the actual victim?"

We accepted the certification because of its importance in the administration of the criminal law and because the reported opinions of our trial Courts are not in harmony.

The defendant is charged with first degree murder in that he "did murder Nancy Lloyd with express malice aforethought by means of shooting the said Nancy Lloyd with a gun". The State expects to prove that the defendant with express malice intended to shoot James Dennis but instead shot and killed Nancy Lloyd against whom the defendant had no actual malice in fact.

The very existence of this problem is explained by the unique history of our statutes, which was discussed at some length in *Bantum v. State*, Del., 7 Terry 487, 85 A. 2d 741. Prior to 1852, the Delaware law followed the com-

mon law in that murder was a single crime. In that year for the first time, it was divided into two degrees. Del. Rev. Code 1852, Ch. 127. First degree murder, punishable with death, was defined as that committed "with express malice aforethought, or in perpetrating, or attempting to perpetrate any crime punishable with death". Second degree murder, punishable with imprisonment for life, was any murder committed "otherwise than is set forth in the preceding section". This distinction was carried down through the years without substantial change and became T. 11 Revised Code 1953, § 571 and § 572. In 1958, the Legislature abolished the death penalty for all crimes, 51 L. of D. Ch. 347 § 1, thus making necessary a change in the definition of first degree murder. Accordingly, by § 2 of the same chapter, the penalty for first degree murder was changed to life imprisonment and it was redefined as that committed "with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping or treason"—those being the only crimes other than first degree murder which had formerly been punishable with death. In 1961, however, the Legislature restored capital punishment for first degree murder. 53 L. of D. Ch. 310. In doing so, it did not alter the definition of first degree murder contained in 51 L. of D. Ch. 347. Our present statute therefore defines this crime as murder committed with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping or treason. Any other kind of murder is of the second degree.*

---

*The use of the terms "express malice" and "implied malice" to distinguish between degrees of murder has been called unfortunate by our Courts as long ago as 1877 in *State v. Thomas*, Del., Houst. Crim.Cas. 511, and as recently as 1960 in *Bennett v. State*, Del., 3 Storey 36, 164 A.2d 442. They are troublesome terms of art, difficult to make plain to a jury; they came into the common law to serve a completely different function; as far as we know, only in Delaware today do we find them being used to spell the difference between life and death.

It will be observed from the foregoing history that the present problem was of little moment until the statute attained its present form in 1961. Before 1852, the difference between express and implied malice was only of academic interest because there were no degrees of murder. From 1852 to 1958, the killing of A when the express malice was directed against B was first degree murder because, even if it be said that such killing was with implied malice, it nevertheless was done in the attempt to perpetrate a crime punishable with death. From 1958 to 1961, the problem existed but was of little practical importance because the punishment for both degrees was the same. Under the present Act. however, the question became one of vital significance because the answer to it determines the degree of the crime and means the difference between death and life imprisonment.

Counsel for this defendant contends that, since any malice which existed was directed toward Dennis and there was none in fact towards the deceased, the malice at most is implied and the crime was accordingly no greater than second degree murder. In short, the argument is that malice, to be express, must be directed toward the person actually killed.

The State contends, on the other hand, that this is not a case in which malice must be implied, because the evidence will show the existence of express malice; and, further, that it is immaterial as to whom it was actually directed since "the malice follows the bullet" or, in other words the malice is transferred from the person intended to be killed to the person actually killed.

As shown in the Bantum case, supra, when the Legislature adopted express and implied malice as the criterion for distinguishing between the two degrees of murder, our Courts were obliged to turn to the common law

for a definition of those terms; they accepted that set forth in IV Blackstone's Commentaries 199. That writer used the present type of case as an illustration of implied malice, citing as authority therefor 1 Hale's Pleas to the Crown 466. Hale and some other early writers who held that some opinion relied upon *Reg v. Saunders,* 2 Plowd. 473, 75 Eng.Rep. 706, and Gore's Case, 9 Coke Rep. 81, 77 Eng.Rep. 853. On the other hand, Coke himself, the reporter of Gore's Case, supra, relied upon these same decisions for his opinion that the present facts demonstrate express malice. III Inst. 51 Cf. 2 Burdick Law of Crime § 450. We point out here that, although the Bantum opinion, supra, accepted the definitions of express and implied malice found in Blackstone, this does not mean that it necessarily accepted all his various illustrations as being correct examples of the distinction. Surprisingly, for example, Blackstone (p. 200) apparently considered a deliberate killing by intentional poisoning to be a case of implied malice, although it would seem that usually the malice in such an instance is clearly express.

Modern text writers have given considerable attention to the present problem. For instance, in the twelfth edition of Wharton's Criminal Law, Vol. 1 § 443, we find the suggestion that the purely logical view is that A, the killer, should be charged with an attempt to murder B, his intended victim, and manslaughter of C, his real victim, if C's death was the result of A's negligence. That author agrees, however, that few if any Courts have taken that view and in § 509 he gives several reasons why it is not unreasonable to consider A's crime first degree murder. The latest (13th) edition of Wharton § 244 agrees that malice, to be express, need not be directed at the particular victim. Burdick, loc. cit., seems to agree with Coke's view that express malice "is so odious that though it be intended against one it shall be extended towards another". A

modern English text states: "His malice (i.e. his intention) is by a legal fiction transferred from the one object to the other. The defendant is then treated for legal purposes as though he had intended to hit the object that he did hit, though in fact he did not have the intent, nor even was reckless as to it". Williams on Criminal Law, (1953) § 33.

The foregoing discussion indicates that Blackstone's view of this subject is by no means unanimously accepted as correct by some of the older writers as well as modern ones; certainly there is no precedent which binds us to accept it. True, this very type of case has been used at times by our trial Judges as an example of implied malice in an effort to explain that term to juries, although there are also reported instances in which the Judges took a contrary view; compare, for example, *State v. Brown,* Del., Houst. Crim. Cas. 539, with *State v. Brown,* Del. 4 Pennewill 120, 53 A. 354; in none of those cases, however, has the point been of controlling significance for the reasons stated earlier herein; moreover, this Court has never before been called upon to consider it.

The great majority of cases in other states accepts the theory of "transferred malice" and considers the defendant guilty of the same crime as if he had accomplished his original purpose. 18 A.L.R. 917. This is conceded by counsel, but they point out that probably no other state save Maine and Texas has had a statute like ours. The Maine law was changed in 1903 to eliminate degrees of murder, see *State v. Arsenault,* Sup., 124 A.2d 741; no decision in that state seems to have dealt precisely with the present question, although in *State v. Cleveland,* 58 Me. 564, the Court used language indicating the view that express malice is only that which is directed towards the intended victim. The Texas statute was similar to ours

until more recently, when degrees of murder were abolished there, see *Mosley v. State,* 149 Tex. Cr.App. 523, 196 S.W.2d 822. Under its former Act, the present type of killing was held to be second degree murder as being based upon implied malice. *Thomas v. State,* 53 Tex.Cr.R. 272, 109 S.W. 155.

The defendant makes an additional argument based upon our statutory history. As mentioned above, under our first Act, murder in the first degree included those done with express malice or in perpetrating or attempting to perpetrate any crime punishable with death. The latter part was changed in 1958 to read "in perpetrating or attempting to perpetrate rape, kidnapping or treason". Counsel argue that, under the original Act, this case would have been first degree murder only because it occurred in the attempt to commit a crime punishable with death; and that the Legislature must have intended to change this type of killing to second degree murder because it did not include first degree murder in the list of crimes specifically mentioned in the latter part of the first degree statute. The argument begs the question, in our opinion. If the theory of transferred malice applies in this State, there was no occasion to include first degree murder in that latter portion because the case would be one of express malice.

 This Court, speaking through Chief Justice Southerland in the Bantum case, supra, carefully explained that express malice consists of 3 elements: (1) malice; (2) a formed design or intention to kill or to do great bodily harm; and (3) a sedate and deliberate mind of which that intention is the product. Nothing whatever was said to suggest that the intention had to be directed to the person actually killed. Presumably the Legislature, or the draftsmen of the amendments in 1958 and 1961,

were familiar with that opinion. Had they wanted to add that element to those laid down by this Court, they could have done so very easily. Undoubtedly, if the General Assembly had desired to make a change of such great importance, it would have said so in positive language, and its failure to do so indicates the intent to make no such change in our definition. We assume that our lawmakers have felt, as did Lord Coke and as do most authorities today, that a man's crime is no less heinous because he happens to kill a different person that he intended to kill.

With deference, we decline to follow the Texas precedents and we accept the summary of the law as thus stated by Dean Burdick in 2 Law of Crime § 450:

"It is not necessary that this state of mind should be directed against a particular person, for if A makes up his mind to kill B, and while trying to carry out his intention kills C who is standing by, express malice exists * * *. In such a case A cannot show that he intended to kill B, because it is the intent to kill, not to kill the person aimed at that constitutes the malice".

In our opinion, this holding represents the more reasonable view of the matter, it is supported by the better authority and it is more probably in accord with the actual intent of the legislative branch of our State.

The question certified to us will accordingly be answered in the affirmative.