# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
     )
     )
     )    **Case No.: 2304008809A/B**
v.      )
     )
**JHALIR HENRY,**      )
     )
Defendant.      )

Submitted: August 2, 2024
Decided: August 12, 2024

## OPINION AND ORDER

*On Defendant's Motion for Judgment of Acquittal*

## DENIED

*Casey L. Ewart, Esquire and Amanda Nyman, Esquire, Deputy Attorneys General*, Georgetown, Delaware, *Attorneys for the State.*

*Patrick Collins, Esquire,* Wilmington, Delaware*, Attorney for Defendant.*

**Jones, J.**

## PROCEDURAL OVERVIEW

On June 26, 2023, a grand jury returned an indictment against Jhalir Henry ("Henry"), Donregus Holland ("Holland"), and Shyheem Latham-Purnell ("Latham-Purnell") for the April 15, 2023 homicide of Corey Mumford in Laurel, Delaware. The Defendants were indicted for Murder 1st Degree, Possession of a Firearm During the Commission of a Felony, Possession of a Firearm by a Person Prohibited, and Conspiracy 1st Degree.

Latham-Purnell pled guilty on May 30, 2024.[1] Trial against Henry and Holland commenced on June 10, 2024. On the second day of jury selection, the parties agreed to waive their right to a jury trial and proceed with the bench trial. On June 24, 2024, the Court acquitted Holland of all charges. The Court found Henry guilty of all charges. Henry has filed a timely Motion for Judgment of Acquittal under Superior Court Criminal Rule 29. This is the Court's decision on that motion.

## STANDARD OF REVIEW

Superior Court Criminal Rule 29 governs Motions for Judgment of Acquittal.[2] The Court will grant a defendant's motion "*only* when the State presented insufficient evidence to sustain a verdict of guilt."[3] If a reasonable

---

[1] Latham-Purnell pled guilty to Manslaughter and Possession of a Firearm During the Commission of a Felony.
[2] Super. Ct. Crim. R. 29(a).
[3] *Vouras v. State*, 452 A.2d 1165, 1169 (Del. 1982) (emphasis added). The review of all the evidence includes all legitimately drawn inferences therefrom. The Court is to make no distinction between direct and circumstantial

person could conclude from the evidence that the defendant is guilty beyond a reasonable doubt, then the evidence is sufficient.[4]  In considering the motion, the Court must view all evidence in a light most favorable to the prosecution.[5]  It is the sole province of the fact finder to determine witness credibility, resolve conflicts in testimony, and draw any inferences from the proven facts.[6]

## FACTS

When the facts are viewed in a light most favorable to the State, they reveal the following about the events of April 15, 2023.

At approximately 2:29 p.m., a caravan of three cars (a Mazda, an Audi, and a Volkswagen) left the Hollybrook Apartments Complex ("Hollybrook"), located in Laurel, Delaware.  Before the cars left Hollybrook, Henry got into the front passenger seat of the Mazda.  The caravan proceeded to a home located at 111 Gibson Avenue, in Laurel, Delaware, the home of Gary Adkins.  The caravan arrived at Gibson Avenue at approximately 2:33 p.m.  The Gibson Avenue address

---

evidence.  *Poon v. State*, 880 A.2d 236, 238 (Del. 2005).  The State is not required to disprove every possible innocent explanation in circumstantial evidence cases.  *Hoey v. State*, 689 A.2d 1177, 1181 (Del. 1997).

[4] *Winningham v. State,* 2023 WL 2843773, at *1 (Del. Apr. 10, 2023); see also *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) (internal citations and quotations omitted).  *Monroe* builds upon the United States Supreme Court's holding in *Jackson v. Virginia*:

> This familiar standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution.  The criterion, thus, impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. 307, 319 (1979), *reh'g denied*, 44 U.S. 890 (1979).

[5] *See Vouras*, 452 A.2d at 1169.

[6] *State v. Pittaway* 2017 WL 5624302 (Del. Super. 2017).

3

is only a few minutes' drive from the Wexford Village Apartments ("Wexford"). It is also a short walk between the two points. Holland got out of the Mazda and got into the gray Volkswagen. The Volkswagen and the Audi left the Gibson Avenue address approximately four minutes before the shooting. These two vehicles proceeded to Wexford. Once arriving at Wexford, the two cars parked next to each other across from and facing Building 105. The cars were immediately in front of Buildings 102 and 103. The cars backed into the spots, which would allow for a quicker get-a-way. The two cars pulled in perfectly together. At least one individual got out of each car.

At the time the two cars pulled into the parking lot, Nakiya Jacobs ("Jacobs") was sitting in a car parked between Buildings 105 and 107, facing Building 105 but closer to Building 105 than the Mazda and Audi. Seated in the car with Jacobs were Asante Lofland, Keishaun Copes, and Kylee Robinson. When the two cars parked, Copes got out of the car and ran to the back of Building 105. A few seconds after the men exited their cars, shots were fired. Jacobs saw two men; the first man was taller, masked up, and wearing a white hoodie and jeans. He ran to the back of Building 105 between Building 105 and 107.

The second male came to the front of Jacobs' car. This man was wearing a gray hoodie with blue and yellow shorts. Jacobs identified this man as Henry. Henry was carrying a black handgun, which he pointed at Jacobs' car. Henry shot

4

in the air in the direction of buildings 102 and 103 (across the street from Building 105) towards where the two vehicles making up the caravan were parked. Shell casings were found in this area and were identified as .40 caliber casings. Henry then went to the back of Building 105, where additional shots were fired.

Larry Horsey, Tyree Cornish, and Corey Mumford were behind Building 105. Horsey heard someone come around the side of Building 105 (between Building 105 and 107) saying "Jha's spinnin" or "Jha's coming." That someone was Copes, who originally had been in Jacobs' car and ran to the back of Building 105 to warn that "Jha was spinning." Jha is Henry's nickname. Spinning means that someone is shooting.

Horsey saw the shooter, wearing all black clothing, a black mask, carrying a black gun in his hand. Numerous 9 mm shell casings were found in the backyard and 9 mm casings were recovered from Mumford's body during the autopsy. Horsey identified Latham-Purnell as Mumford's shooter. Horsey ran from the Mumford shooting and saw a third unidentified shooter, by the house's air conditioner, on the opposite side of the building from where the other two shooters were observed. Numerous .40 caliber casings were found near this air conditioner.

Cornish was also present at the shooting, behind Building 105. Cornish saw someone come around the building between 105 and 107 saying "Jha's coming," at which point he ran. Cornish saw three to four shooters, one he identified as

Henry. The evidence clearly establishes there were at least three (3) shooters, and two of them were Latham-Purnell and Henry.

After the incident, the shooters returned to their cars. The cars left quickly, at the same time, and behind one another. After the shooters left the scene, Jacobs went to the back of Building 105. She found Mumford laying on the ground, gasping for air. Mumford eventually died from his gunshot wounds. The autopsy revealed that nine (9) shots entered Mumford's body.

## ANALYSIS

In its closing and rebuttal statements, the State acknowledged that the gunmen had likely planned to shoot and kill someone other than Mumford. The State suggested that one possible target could have been Copes, who ran behind Building 105 as soon as he saw the gunmen get of their cars and shouted out the warning that "Jha's spinning." During closing, and again in this Motion, Henry contends that the State was required to prove, as an element of the crime of Murder 1st Degree, that the shooters specifically intended to kill Mumford rather than some other person.

Defendant was convicted under 11 *Del.C.* §636(a)(1), which provides that "[a] person is guilty of murder in the first degree when … the person intentionally causes the death of another person."[7] Under the plain language of the statute, the

---

[7] 11 *Del.C.* §636(a)(1).

element of intent is directly linked to the concept of causing another person's death, not to the identity of the person who died. In other words, it does not matter whom Defendant actually killed, as long as he acted with the intent to cause *someone's* death.

11 *Del.C.* §231 sets the forth the definition related to an offender's state of mind: "A person acts intentionally with respect to an element of an offense when … [i]f the element involves the nature of the person's conduct or a result thereof, it is the person's conscious object to engage in conduct of that nature or to cause that result."[8] In the case at bar, the nature of Defendant's conduct was to shoot and kill another person, and the evidence established that he caused such a result.

Neither the identity of the victim, nor establishing that the person who died was the Defendant's specific target, are elements of this crime. In fact, the law specifically allows for an offender to be convicted based on the theory of "transferred intent," as set forth in 11 *Del.C.* §262:

> The element of intentional or knowing causation is not established if the actual result is outside the intention or the contemplation of the defendant unless:
>
> (1) *The actual result differs from that intended or contemplated,* as the case may be, *only in the respect that a different person* or different property *is injured or affected* or that the injury or harm intended or contemplated would have been more serious or more extensive than that caused….[9]

---

[8] *Id.* §231(b)(1).
[9] 11 *Del.C.* §262(1) (emphasis added).

Nothing in this statute indicates that the State must prove the identity of the original intended victim; instead, it simply states that a defendant's culpability for a crime does not change simply because he ended up harming someone different than expected.

Defendant's Motion fails to cite any meaningful authority indicating that the State must prove intent to kill a specific person before that intent can be transferred to the person who ended up being the actual victim of the crime.[10]  In fact, Delaware law is to the contrary.  As the Supreme Court of Delaware held in *State v. Gardner*:[11]

> "[i]t is not necessary that this state of mind should be directed against a particular person, for if A makes up his mind to kill B, and while trying to carry out his intentions kills C who is standing by, express malice exists ***.  In such a case, A cannot show that he intended to kill B, because *it is the intent to kill, not to kill the person aimed at, that constitutes the malice.*"[12]
> (Emphasis added).

It is the intent to kill that is required, not who the original target was.  The evidence submitted at Defendant's trial established that Henry and his fellow shooters were acting with the intent to kill on the day Mumford died.

The evidence established that three different guns were used in this crime, and that the gunmen fired at least 22 rounds from multiple locations around

---

[10] Def.'s Motion at 15-20.
[11] 203 A.2d 77 (Del. 1964).
[12] *Id.* at 82 (citation omitted)(emphasis added).

Building 105 in Wexford.  The evidence showed that Mumford suffered *nine* different gunshot wounds.  The shooters' intent to kill is demonstrated in part from the ballistics and autopsy findings submitted at trial.  Surveillance footage and witness testimony confirms the shooters' intent: the gunmen were part of a caravan that travelled across Laurel together to Wexford; the gunmen arrived together, backing their cars into parking spaces in order to allow for an easier getaway; multiple men exited those vehicles at the same time, ran toward Building 105 while firing their guns, and took up positions in different areas around the building; despite the presence of a number of different people in and around Building 105, the gunmen fired off a least 22 rounds, nine of which struck Mumford; and the men then returned to their vehicles together and fled the scene.

The fact that the gunmen potentially fired some of these shots out of each other's lines of sight is irrelevant,[13] because the evidence shows that they were acting in concert with one another in pursuit of a common objective.  It likewise does not matter whether Defendant fired his gun in the air, towards Jacobs and in the direction of the parking lot, or if it was his specific shots that struck Mumford, because the evidence leaves no doubt that either Henry and/or his co-conspirators fired nine shots into Corey Mumford's body and that he died as a result.  There can be no reasonable doubt that Mumford was intentionally killed.

---

[13] Def.'s Motion at 14.

Defendant next argues that the State did not present sufficient evidence to establish that he was acting in concert with the other gunmen at Wexford when Mumford was murdered.[14]  The evidence submitted at trial was more than sufficient to prove that Defendant was acting as part of a conspiracy to commit murder and that he aided in that effort.

The accomplice liability statute provides, in pertinent part, that "[a] person is guilty of an offense committed by another person when … [i]ntending to promote or facilitate the commission of the offense the person: [s]olicits, requests, commands, importunes, or otherwise attempts to cause the other person to commit it; or [a]ids, counsels, or agrees or attempts to aid the other person in planning or committing it…."[15]  "While mere presence at the scene of a crime is not sufficient to prove accomplice liability, 'a simple word or gesture may be enough' to show that an individual 'actively encouraged the principal to commit the crime.'  Such encouragement must occur prior to or during the other person's commission of the crime."[16]

The evidence at trial established that Defendant acted as an accomplice in the death of Mumford.  The evidence submitted at trial established that Defendant arrived with the other shooters, exited his car, and ran toward Building 105 while

---

[14] Def.'s. Motion at 20.
[15] 11 *Del.C.* §271(2).
[16] *Clay v. State*, 164 A.3d 907, 914 (Del. 2017) (internal footnotes omitted).

firing shots, and even went back to the rear of Building 105 before he and the other shooters fled Wexford together.

The evidence of Defendant's participation in this incident was much more substantial than a simple word or gesture. The evidence showed that Henry was present at Hollybrook Apartments with the other involved individuals and vehicles, that the car that he was in at the time was a part of the caravan of vehicles that left Hollybrook and drove to 111 Gibson Avenue, and that he then switched vehicles and got into a gray Volkswagen before it continued on to Wexford with at least two other people in a caravan of two cars.

Once at Wexford, at least three individuals got out of the vehicles at approximately the same time, they fired shots, and then returned to those vehicles, leaving Wexford in a hurry. The testimony made it clear the gunmen were working together. Jacobs testified that Henry exited one of two cars that arrived together in Wexford, that Henry fired shots in the parking lot near Jacobs' car, and that Henry went to the backyard or corner of Building 105 before returning to one of the two cars that then fled, again together. The ballistics evidence also shows that there were at least three guns involved with three different sets of casings recovered from locations around Building 105. It is clear that the men who exited the caravan of cars, Henry included, were working in concert. The plan these Defendants formulated prior to arriving is demonstrated by their actions. The

11

evidence at trial established that Defendant Jhalir Henry was at least an accomplice in the murder of Corey Mumford.

Defendant's Motion asserts that "[t]he evidence demonstrates that if Henry was complicit as an accomplice upon leaving Gibson Avenue, he had deprived [the] offense of his complicity by the time of his arrival at Wexford" and that he is therefore exempt from liability in Mumford's murder.[17] "[A] person is not liable for an offense committed by another person if … [t]he person terminates complicity prior to commission of the offense and: [w]holly deprives it of effectiveness in the commission of the offense; or [g]ives timely warning to the Attorney General or the police or otherwise makes a proper effort to prevent the commission of the offense."[18] The evidence at trial showed that Henry did not terminate his complicity before the commission of the offense.

Defendant argues that he terminated his complicity because he did not go straight to the backyard, choosing instead to fire off some rounds while he was standing in front of Jacobs' car;[19] however, this did not terminate his complicity under the meaning of 11 *Del. C.* §273. Even if Defendant's actions could be considered an attempt to terminate his involvement (which they were not), the plain language of the statute requires that the termination occur *prior* to the

---

[17] Def.'s Motion at 22-23.
[18] 11 *Del.C.* §273(d). Defendant has not asserted that he took steps to notify authorities of the impending crime, or that he made any effort to prevent its commission.
[19] Def.'s Motion at 23.

commission of the offense, not *during it*. Defendant's actions, including arriving and leaving in tandem with his co-conspirators, repeatedly shooting a gun while in the vicinity of Building 105, and eventually going to the back corner of the building where Corey Mumford's body was located, demonstrate that he was an active participant from start to finish. This makes him liable for Mumford's murder as an accomplice.

For the above reasons, Defendant's Motion for Judgment of Acquittal is hereby **DENIED**.

**IT IS SO ORDERED**.

_____
Francis J. Jones, Jr., Judge

cc:    *Original to Prothonotary*